**ASSET PURCHASE AGREEMENT**

by and among

552 Golf Links Road Realty, LLC
An Arkansas limited liability company

"Seller"

and

552 Golf Links Road, LLC
An Indiana limited liability company

"Purchaser"


Dated as of: April 17, 2019


552 Golf Links Road, Hot Springs, Arkansas 71901

## TABLE OF CONTENTS

**SECTION**        **PAGE**

1.  Sale and Purchase of Purchased Assets ........................................................................1
2.  Liabilities of Seller ........................................................................................................2
3.  Purchase Price; Escrow .................................................................................................2
4.  Time and Place of Closing .............................................................................................3
5.  Due Diligence; Title and Survey; and Licensure ..........................................................4
6.  Conditions to Closing.....................................................................................................6
7.  Apportionments ............................................................................................................11
8.  Interim Operations .......................................................................................................11
9.  Seller's Representations and Warranties ......................................................................14
10. Purchaser's Representations and Warranties................................................................16
11. Risk of Loss..................................................................................................................14
12. Indemnification ............................................................................................................15
13. Remedies ......................................................................................................................19
14. Notices .........................................................................................................................17
15. Closing Costs ...............................................................................................................18
16. Choice of Law ..............................................................................................................18
17. Miscellaneous...............................................................................................................18

## EXHIBITS

| | |
|---|---|
| A. | Legal Description of Land |
| B. | Allocation of Purchase Price |
| C | RESERVED |
| D. | Form of Deed |
| E. | Form of Bill of Sale and Assignment |
| F. | Form of FIRPTA Affidavit |

## SCHEDULES

| | |
|---|---|
| 1 | Excluded Assets |
| 3(a) | Debt Assumption Amount |
| 9(i) | Permits |
| 9(m) | Litigation |

{1000/122/00247314.2}

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement"), is made as of the 17th day of April, 2019 (the "Effective Date"), by and among 552 Golf Links Road Realty, LLC, an Arkansas limited liability company ("Seller"), and 552 Golf Links Road, LLC, an Indiana limited liability company ("Purchaser").

WHEREAS, Seller is currently the fee owner of the Property (as defined herein), and Heritage of Hot Springs Health and Rehab, LLC (hereinafter "Old Operator") was the licensed operator of the Facility (as defined herein) thereon;

WHEREAS, Seller currently leases the Facility to New Operator (the "Existing Facility Lease");

WHEREAS, Seller desires to sell and Purchaser desires to purchase the Purchased Assets (as defined herein) and other assets subject to the terms and conditions of this Agreement;

WHEREAS, in connection with the foregoing, Old Operator and Seller had entered into that certain Operations Transfer Agreement (the "OTA") with Hot Springs Nursing and Rehabilitation – A Waters Community, LLC (the "New Operator"), which provided the rights and obligations of the parties thereto relative to the transition of the operations of the Facility from Old Operator to New Operator;

NOW THEREFORE, in consideration of the mutual covenants and provisions herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows:

1.  **Sale and Purchase of Purchased Assets**.

    (a)    Sale and Purchase of Purchased Assets.  Subject to the provisions set forth herein, Seller (and Old Operator as required under the OTA) hereby agrees to sell, convey, assign, deliver and transfer, free and clear of all claims, liens, deeds of trust, mortgages, easements, restrictions, encumbrances or security interests of any nature whatsoever except for Permitted Exceptions (as herein defined), and Purchaser hereby agrees to purchase, acquire, accept and assume, upon the terms and conditions hereinafter set forth, all of the following assets (collectively, the "Purchased Assets"): (i) the property consisting of those certain plots, pieces or parcels of land located in the City of Hot Springs, Garland County, State of Arkansas, as more particularly described in **Exhibit A** hereto (the "Land"), (ii) all buildings and all other structures, facilities or improvements presently or hereafter located in or on the Land (the "Improvements", and together with the Land, the "Property"), including without limitation, that certain 184 bed skilled nursing facility commonly known as "Hot Springs Nursing and Rehabilitation – A Waters Community, LLC" located at 552 Golf Links Road, Hot Springs, Arkansas 71901 (the "Facility"), and all other items of furniture, fixtures, equipment and any other

1

personal property attached or appurtenant to, located on or used in connection with the ownership, use, operation or maintenance of the Land, the Improvements and/or the Facility (collectively, the "Personal Property"), other than the Supplies (as such term is defined in the OTA) which shall be transferred to New Operator pursuant to the OTA, (iii) all right, title and interest, if any, of Seller in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof, (iv) all right, title and interest, if any, of Seller to any unpaid award for (1) any taking by condemnation or (2) any damage to the Land or the Improvements by reason of a change of grade of any street or highway, (v) all easements, licenses, rights and appurtenances relating to any of the foregoing, (vi) all intangible property of Seller; (vii) the Warranties (as defined herein), (viii) the Permits (as defined herein), (ix) all of the goodwill symbolized and associated with the Facility, (x) any bed rights and other assets located at or used in connection with the Facility, and (xi) any other assets of Seller, other than those items listed on Schedule 1, attached hereto, which shall be specifically excluded from the Purchased Assets (the "Excluded Assets").

2.     **Liabilities of Seller**. Purchaser shall not assume and shall not be liable for, any debts, liabilities or obligations of Seller of any kind or nature, at any time existing or asserted, whether or not accrued, whether fixed, contingent or otherwise, whether known or unknown, arising out of this or any other transaction or event, including, but not limited to, any (i) liabilities or obligations of Seller to any of their creditors, shareholders or owners, (ii) liabilities or obligations of Seller with respect to any acts, events or transactions occurring prior to, on or after the Closing Date, or (iii) liabilities or obligations of Seller for any federal, state, county or local taxes applicable to or assessed against Seller or the assets or business of Seller. Unless specifically and unambiguously set forth herein to the contrary, Purchaser is not the successor to liability of Seller and is not herein assuming any liability arising from, out of, or relating to, Seller' ownership or operation of the Purchased Assets. Purchaser does not assume any payable of Seller, governmental claim or charge, malpractice, professional liability, resident rights violations, or violations of employee rights or contracts, whether such claims arise in law, equity, in tort, contract, from statute, common law, or from any other source or precedent.

3.     **Purchase Price; Escrow**.

(a)     Purchase Price. The purchase price ("Purchase Price") for the Purchased Assets shall be assumption of, or otherwise satisfying the debt on Schedule 3(a), subject to prorations as set forth herein. The parties agree to a transfer of escrows held by the lender as a partial satisfaction for the prorations required pursuant to this agreement and the OTA. The parties shall use best efforts to agree upon a joint allocation of the Purchase Price, as set forth in **Exhibit B** attached hereto. Each party agrees (i) to complete jointly and file separately Form 8594 with its federal income tax return consistent with such allocation for the tax year in which the Closing occurs, and (b) that no party shall take a position on any income, transfer, gains or other tax return, or before any federal, state or local governmental or quasi-governmental authority or in any judicial proceeding that is in any manner inconsistent with the terms of such agreed upon allocation.

(b)     <u>Reserved.</u>

(c)     <u>Reserved.</u>

(d)     <u>Closing Escrow</u>.  Prior to the Closing Date, Purchaser and Seller shall provide to the Title Company (as defined herein) joint escrow instructions to open an escrow for the consummation of the sale of the Purchased Assets to Purchaser pursuant to the terms of this Agreement in accordance with the general provisions of the usual form of joint escrow instructions used in similar transactions by such holder with special provisions inserted to conform with this Agreement, as shall be mutually acceptable to the parties hereto.  Provided that all conditions to Closing set forth in this Agreement have been satisfied or, as to any condition not satisfied, waived by the party intended to be benefited thereby, on the Closing Date, the Title Company shall conduct the Closing by recording or distributing the following documents and funds in the following manner:

(i)     Record the Deed (as hereinafter defined) in the official records of the county in which the Land is located;

(ii)     Deliver to Purchaser all documents that are required to be delivered by Seller to Purchaser pursuant to <u>Section 6(a)</u> hereof (to the extent the same shall be delivered to the Title Company at or prior to the Closing); and

(iii)     Deliver to Seller ($x$) all documents that are required to be delivered by Purchaser to Seller pursuant to <u>Section 6(b)</u> hereof (to the extent the same shall be delivered to the Title Company at or prior to the Closing), and ($y$) the Purchase Price and such other funds, if any, as may be due to Seller by reason of credits under this Agreement, less all items chargeable to Seller under this Agreement.

4.     **Time and Placing of Closing**.  The closing of the transactions contemplated hereby (the "<u>Closing</u>") shall take place, subject to satisfaction of the closing conditions set forth in <u>Section 6</u> hereof, upon that later to occur of (i) the first day of the first calendar month following the date that is thirty (30) days following the expiration of the Due Diligence Period, or (ii) the first day of the first calendar month following receipt of the Regulatory Approvals (as defined herein), or such other time as mutually agreed upon between the parties; provided however, that if the Regulatory Approvals are received later than the twentieth (20th) day of a calendar month, the Closing shall take place on the first day of the second calendar month following receipt of the Regulatory Approvals.

5.     **Due Diligence; Title and Survey; and Licensure**.

(a)     <u>Due Diligence Period</u>.  Purchaser shall have the right, at reasonable times and on reasonable prior notice to Seller to enter upon the Property to conduct such inspections, investigations, tests and studies as Purchaser shall deem necessary, including, without limitation, environmental site assessments, engineering tests and studies, physical examinations of the Property, due diligence investigations and

feasibility studies. To the extent Purchaser hires any third party site inspectors, engineers or other parties that will invasively inspect and/or test the Property, Purchaser will first ensure that such third party(ies) have adequate insurance covering any potential damage done to the Purchased Assets as a result of such inspection/testing. Purchaser shall also have the right to tour the Facility, to review the books and records related to the financial condition and the operations thereof and to observe the day-to-day operations and management thereof. Purchaser shall visit the Facility within fifteen (15) business days of the Effective Date. This Agreement shall be subject to the condition that Purchaser shall determine during the period ending upon the date that is thirty (30) days following the Effective Date (the "Due Diligence Period"), that Purchaser is satisfied with the physical and environmental condition of the Property and all improvements thereon, as well as the financial condition and operations of the Facility. If Purchaser shall not be so satisfied and Purchaser notifies Seller thereof in writing on or prior to the end of the Due Diligence Period, this contract shall be null and void and the Deposit plus any accrued interest thereon shall be returned to the Purchaser. If Purchaser fails to give such notice to Seller, it shall be conclusively presumed that Purchaser is satisfied with its due diligence review, and this Agreement shall continue in full force and effect.

(b)     Title and Survey.

(i)     Purchaser has ordered from Chicago Title Insurance Company (the "Title Company") a commitment (the "Title Commitment") for an ALTA 2006 owner's title insurance policy (the "Title Policy"), committing to insure title to the Property. Purchaser may elect to obtain extended coverage over General Exceptions 1 through 5 inclusive in the Title Policy as well as additional endorsements including (i) survey endorsement, (ii) unconditional Comprehensive Endorsement No. 1, (iii) ALTA Endorsement Form 3.1 endorsement (including compliance with parking requirements) which must specifically state that the use of the Facility and the Land are "permitted uses" under the governing zoning ordinance, (iv) location endorsement, (v) access endorsement, (vi) one tax parcel endorsement, (vii) if the Land consists of more than one subparcel, contiguity endorsement, (viii) environmental lien endorsement, and (ix) such other endorsements as Purchaser may reasonably require (items (i) through (ix) collectively referred to herein as the "Title Endorsements"); and

(ii)     Purchaser may elect to order a currently dated ALTA survey of the Property (the "Survey"), which shall be certified by a licensed surveyor and in a form and substance satisfactory to Purchaser and the Title Company in order for the Title Company to issue the Title Policy. The Survey shall be made in accordance with (i) the current survey standards of the American Land Title Association and American Congress on Surveying and Mapping including such Table A items as are requested by Purchaser, and (ii) the laws of the State of Arkansas. The Survey shall bear a proper certificate by the surveyor, which certificate shall recite compliance with the laws and standards enumerated above, shall include the legal description of the Property and shall run in favor of

Purchaser and the Title Insurance Company. Seller shall execute affidavits of no-change to any existing survey supplied and relied upon by the Title Company.

(c)  _Title Defects_.  Within fifteen (15) business days following Purchaser's receipt of both the Title Commitment and Survey, Purchaser shall notify Seller of any matters shown on the Title Commitment, Survey, or zoning report that are not acceptable to Purchaser, including but not limited to any zoning and special flood hazard area issues (such exceptions referred to herein as the "_Title Defects_").  If any updates to the Title Commitment or Survey shall disclose any additional matters, Purchaser shall have five (5) business days from the receipt of such updates within which to notify Seller thereof, in which case any such matters for which Purchaser provides notice shall also be treated as "Title Defects" hereunder.  In the event that any Title Defects have not been cured by the Seller on or before the date that is fifteen (15) business days prior to the Closing, Seller may elect in its sole discretion, by written notice to Purchaser, to either (i) undertake at its expense to cure such Title Defects prior to the Closing (the "_Seller's Election_"), or (ii) not cure such Title Defects.  In the event that Seller does not elect to cure such Title Defects pursuant to the immediately preceding sentence, Purchaser may, by notice to Seller on or prior to Closing (x) terminate this Agreement, in which event the Deposit plus all accrued interest shall be returned to Purchaser and all parties shall be relieved of any further obligations or liabilities hereunder, or (y) indicate to Seller that, notwithstanding the Title Defects described in this _Section 5(c)_, Purchaser shall not terminate this Agreement as a result of such Title Defects (such Title Defects, as well as any matters shown in the Title Commitment or Survey to which Purchaser does not object as permitted herein, being thereafter deemed as "_Permitted Exceptions_" hereunder); provided, however, that Purchaser's failure to notify Seller of its intentions pursuant to this sentence shall be deemed Purchaser's intention to proceed hereunder. Notwithstanding the foregoing, Purchaser shall not be required to object to, and Seller shall be required to pay off at the Closing, any financing obtained or assumed by Seller and secured by a mortgage covering the Property and to either pay off or cause the Title Company to insure or endorse over any mechanic's or materialmen's liens for work or materials undertaken or acquired by or on behalf of Seller, any tax or judgment lien against Seller, and any other exceptions or encumbrances to title that may be cleared through the payment of money (provided, however, Seller shall be entitled to utilize the Purchase Price proceeds to effectuate any or all of the foregoing).

(d)  _Regulatory Approvals_. On or before the expiration of the Due Diligence Period, Purchaser shall take, and cause New Operator to take, all steps which may be taken prior to the Closing in order to obtain on or after the Closing all governmental, quasi-governmental and other regulatory approvals that are required as a result of the transactions contemplated in this Agreement and the OTA, including without limitation: i) the submission to the Arkansas Department of Human Services (the "_ADHS_") of an application for licensure ("_Licensure_") with respect to operation of the Facility, ii) a Certificate of Need application approved by the ADHS with respect to operation of the Facility, and iii) applications to be certified to participate in the Medicare and Medicaid

reimbursement programs (the foregoing, collectively, the "Regulatory Approvals"). Seller agrees to use its best efforts and cooperate with Purchaser and New Operator, as the case may be, in obtaining such Regulatory Approvals.

6.    **Conditions to Closing**.

(a)    Purchaser's Conditions.    Purchaser's obligation to consummate the transactions contemplated in this Agreement, pay the Purchase Price and accept title to the Purchased Assets shall be subject to the following conditions precedent on and as of the Closing Date to the reasonable satisfaction of Purchaser or the waiver thereof by Purchaser, which waiver shall be binding upon Purchaser only to the extent made in writing and dated on or prior to the Closing Date.

(i)    Seller shall have performed and complied with all covenants and conditions required by this Agreement to be performed or complied with by Seller.

(ii)    Possession of the Property shall be delivered to Purchaser free and clear of all tenancies and other occupancies and the Purchased Assets shall be delivered to Purchaser free and clear of any liens and encumbrances except for any Permitted Exceptions, any occupancy rights of any residents of the Facility.

(iii)    Seller shall deliver to Purchaser or, if applicable, to the Title Company to be held in escrow in accordance with the terms of this Agreement, on or before the Closing Date the following, each of which shall be in form and substance satisfactory to Purchaser:

(1)    a Special Warranty Deed, in substantially the form annexed hereto as **Exhibit D** (the "Deed") and in proper statutory form for recording, duly executed and acknowledged by Seller, sufficient to convey to Purchaser fee simple title to the Property free of all liens and encumbrances other than the Permitted Exceptions;

(2)    a bill of sale, in substantially the form annexed hereto as **Exhibit E** (the "Bill of Sale and Assignment"), containing covenants of title, duly executed and acknowledged by Seller, sufficient to convey to Purchaser good and indefeasible title, free of all liens, encumbrances and security interests, in and to the Personal Property;

(3)    an affidavit of title and such other affidavits as may be required by the Title Company in connection with the conveyance of the Property;

(4)    an assignment by Seller (as applicable), in substantially the form annexed hereto as **Exhibit E** (the "Bill of Sale and Assignment"), of

all of Seller's right, title and interest in, to and under the items described in Section 1(b) above;

(5)     termination of the Existing Facility Lease (and any sub lease if applicable) with respect to the Facility;

(6)     all licenses, permits, and certificates of occupancy, if any, issued by any federal, state, municipal or local governmental authority relating to the use, maintenance, occupancy or operation of the Facility running to, or in favor of, Seller, to the extent legally assignable (including all modifications thereto or renewals thereof) (collectively, the "Permits"), except to the extent the same are required to be and are affixed at the Property, and of variances issued by any municipal, state or federal agency or authority relating to the ownership, use, occupancy, operation or maintenance of the Property;

(7)     counterpart copies of all guaranties or warranties then in effect, if any, with respect to the Improvements and the Personal Property (the "Warranties");

(8)     a complete set of keys for the Improvements, appropriately tagged for identification;

(9)     the Foreign Investment in Real Property Tax Act affidavit in substantially the form annexed hereto as **Exhibit F**;

(10)     a form 1099 identifying Seller's gross proceeds and Seller's tax identification number, as required by the Title Company;

(11)     the duly executed certificate of an authorized officer of Seller or its managing constituent, dated as of the Closing Date, to the effect that (A)  Seller is validly existing under the laws of the State of Arkansas, (B)  Seller has all requisite power and authority to perform the terms of this Agreement, (C) this Agreement and all documents to be executed and delivered pursuant hereto (the "Other Documents") have been duly authorized, executed and delivered by Seller pursuant to all necessary resolutions or consents of the appropriate governing body of Seller, and appearing on said certificate are the true signatures of all persons who have executed this Agreement and the Other Documents on behalf of Seller, (E) the executing persons are fully authorized to act on behalf of Seller or its constituent partners or members, as applicable and (F) as of the Closing Date, the representations and warranties of Seller set forth in this Agreement are true and complete and Seller is otherwise in full compliance with the terms and conditions of this Agreement; and

(12)   such other customary closing documents required in the State of Arkansas, Garland County, and/or the City of Hot Springs.

(iv)   Purchaser shall receive from the Title Company an ALTA 2006 owner's policy of title insurance, or a New York style mark-up to the Title Commitment which shall act as an irrevocable and unconditional commitment to issue the same, in an amount equal to the Purchase Price, dated, or updated to, the Closing Date, insuring, or committing to insure Purchaser's good and marketable title in fee simple to the Property subject only to the Permitted Exceptions and shall include extended coverage over General Exceptions 1 through 5 inclusive and contain the Title Endorsements.

(v)   Purchaser shall have received the Survey as required under Section 5(b)(ii).

(vi)   Intentionally Deleted

(vii)   Old Operator and New Operator shall have entered into and consummated the transactions contemplated under the OTA.

(viii)   Intentionally Deleted

(ix)   On the Closing Date there shall not be any lawsuits filed or threatened against Seller that are not covered by insurance and being defended, subject to policy limits and any reservation of rights; nor shall there be any actions, suits, claims or other proceedings, pending or threatened, or injunctions or orders entered, pending or threatened against Seller, to restrain or prohibit the consummation of the transactions contemplated hereby.

(x)   As of the Closing Date, there shall have been no material and adverse change from the date hereof in the condition of the Purchased Assets, or any portion thereof, or in the Facility's operations, Applicable Laws (as defined herein), Permitted Exceptions, contractual relations, regulatory status, or any other circumstances affecting the Purchased Assets previously approved by Purchaser, including without limitation, the operations and/or the status of the Facility as a licensed 152 bed skilled nursing.

(xi)   Purchaser shall have approved of any updates to the Schedules and/or Exhibits, pursuant to Section 17(e).

(xii)   There shall not have been disclosed any adverse environmental conditions, on Phase I studies ordered by Purchaser and/or its lender.

(xiii)   The representations and warranties of Seller contained in this Agreement shall be true and complete as of the Closing Date and Seller shall be in

full compliance with the terms and provisions of this Agreement, in each case subject only to exceptions permitted by this Agreement.

(b) Seller's Conditions. Seller's obligation to consummate the transactions contemplated in this Agreement and deliver title to the Property shall be subject to the following conditions precedent on and as of the Closing Date to the reasonable satisfaction of Seller or the waiver thereof by Seller, which waiver shall be binding upon Seller only to the extent made in writing and dated as of the Closing Date.

(i) Purchaser shall deliver the balance of the Purchase Price due hereunder, subject to prorations as provided herein.

(ii) Purchaser shall deliver the following:

(1) the duly executed certificate of an authorized officer of Purchaser or its managing constituent, dated as of the Closing Date, to the effect that (A) Purchaser has been duly organized and is validly existing in good standing under the laws of the State of Indiana, (B) Purchaser has all requisite power and authority to perform the terms of this Agreement, (C) this Agreement and all documents Other Documents have been duly authorized, executed and delivered by Purchaser pursuant to all necessary resolutions or consents of the appropriate governing body of Purchaser, and appearing on said certificate are the true signatures of all persons who have executed this Agreement and the Other Documents on behalf of Purchaser, (E) the executing persons are fully authorized to act on behalf of Purchaser or its constituent partners or members, as applicable and (F) as of the Closing Date, the representations and warranties of Purchaser set forth in this Agreement are true and complete and Seller is otherwise in full compliance with the terms and conditions of this Agreement; and

(2) counterparts of the Other Documents as applicable, duly executed and acknowledged by Purchaser, as and to the extent herein provided.

(iii) The representations and warranties of Purchaser contained in this Agreement shall be true and complete as of the Closing Date and Purchaser shall be in full compliance with the terms and provisions of this Agreement, in each case subject only to exceptions permitted by this Agreement.

(iv) Old Operator and New Operator shall have entered into and consummated the transactions contemplated under the OTA.

(c) Waiver. In the event that either of the parties hereto (a "Waiving Party") waives a condition precedent to its performance hereunder, or otherwise elects to proceed with the Closing despite the fact that one or more conditions precedent to its performance

have not been satisfied, such action by the Waiving Party shall in no way be deemed a waiver of any payment, indemnification or other rights of the Waiving Party with respect to such condition, and the Waiving Party shall be entitled, following the Closing, to pursue any and all available remedies at law or equity with respect thereto.

7.     **Apportionments**.

(a)     <u>Closing Prorations</u>.  The following items shall be apportioned at the Closing between periods prior to Closing and periods following Closing, as of the Closing Date, and  the Purchase Price shall be increased in the amount of any such items that relate to periods following the Closing, and decreased in the amount of any such items that related to periods prior to the Closing.

(i)     Real estate taxes, assessments (other than special assessments), personal property taxes, and water, vault and sewer charges, as well as any other governmental charges or taxes assessed on the Property and other Purchased Assets, based on the rates and assessed valuation applicable in the fiscal year for which assessed; provided that if the Closing shall occur before the real estate tax rate or personal property tax rate is fixed, the apportionment of said taxes shall be based one hundred ten percent (110%) of the most recently ascertainable real estate tax fiscal year and shall be re-prorated following receipt of the actual bill with respect to the applicable period.  Allocation of real estate taxes billed with respect to the Property to yearly periods shall be determined in accordance with local custom, as determined by the Title Company.  If, at the Closing, the Property or any part thereof is affected by an assessment which, at the option of Seller, is payable in installments and the first installment is then a charge or lien, or has been paid, then all unpaid installments of such assessments, including those which are to become due and payable after Closing, shall be deemed to be due and payable and to be a lien upon the Property and shall be paid and discharged by Seller at Closing, or, alternatively, a credit to the Purchase Price shall be given to Purchaser of an amount equal to such unpaid installments.

(ii)     All charges and payments for utility services; provided that if there is no meter or if the current bill for any of such utilities has not been issued prior to the Closing Date, then such charges shall be adjusted at the Closing on the basis of the charges for the prior period for which bills were issued and shall be further adjusted when the bills for the current period are issued; provided further, to the extent possible, Seller shall terminate its accounts with the utility service providers and Purchaser shall establish its accounts with such utility service providers effective on the Closing Date, in which event, there shall be no proration for such utility services.

(b)     <u>Survival</u>.  The obligations of the parties hereto under this <u>Section 7</u> shall survive the Closing.

8. **Interim Operations**. From the Effective Date until Closing, Seller shall (a) maintain the Purchased Assets in substantially the same condition as they existed on the Effective Date, and not allow any deterioration of value to occur with respect to the Purchased Assets; (b) maintain its current insurance policies in full force and effect through the Closing Date; (c) not create any lien or encumbrance upon or affecting title to the Property or the Purchased Assets except Permitted Exceptions, without Purchaser's prior written consent; (d) not take any action which will or would cause any of the representations or warranties in this Agreement to become untrue or be violated without the prior written consent of Purchaser, which consent shall be provided or denied within ten (10) business days after request therefor; (e) perform all of their obligations in respect of the Purchased Assets whether pursuant to any contracts, or other requirements affecting the Purchased Assets; (f) promptly inform Purchaser in writing of any material event adversely affecting the ownership, use, occupancy, operation, management or maintenance of the Purchased Assets, whether or not insured against; and (g) not solicit, accept or provide factual information or negotiate with respect to, any offer to purchase any of the Purchased Assets from any person or entity other than Purchaser. Wherever Purchaser's consent is required hereunder, such consent shall not be unreasonably withheld or delayed.

9. **Seller's Representations and Warranties**. Seller hereby makes the representations and warranties contained in this Section 9, to Purchaser. These representations and warranties are made as of the date hereof, and shall be deemed remade as of the Closing Date.

    (a) Organization and Authority. Seller is a limited liability company that validly exists under the laws of Arkansas. Old Operator is a limited liability company that validly exists under the laws of Arkansas. Both Seller and Old Operator have full power and right to enter into and perform their obligations under this Agreement and the Other Documents, including, without being limited to, conveying the Property. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (1) have been duly authorized by all necessary action on the part of Seller, (2) do not require any governmental or other consent and (3) will not result in the breach of any agreement, indenture or other instrument to which Seller is a party or is otherwise bound.

    (b) Non-Foreign Status. Seller is a "non-foreign person" within the meaning of Section 1445 of the United States Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

    (c) Condition of the Purchased Assets. There exists no defective condition, structural or otherwise, with respect to the Purchased Assets. In addition, Seller has not received any written notice from any insurance company which has issued a policy with respect to Purchased Assets or from any board of fire underwriters (or other body exercising similar functions) and any governmental authority or any other third party claiming any defects or deficiencies in Purchased Assets or suggesting or requesting the performance of any repairs, alterations or other work to the Purchased Assets. The

Assets shall be delivered at the time of the Closing in the same condition as they are in on the date hereof, reasonable wear and tear excepted.

(d)     Environmental Condition.  Seller has not generated, stored or disposed of any hazardous waste on the Property, and there is not currently any hazardous waste on the Property.   The term "hazardous waste" shall mean "hazardous waste", "toxic substances" or other similar or related terms as defined or used from time to time in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, *et seq.*), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, *et seq.*), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6921, *et seq.*) and regulations adopted thereunder.

(e)     Special Assessments.  There are no (1) pending or threatened special assessments affecting the Purchased Assets or (2) any contemplated improvements affecting the Purchased Assets that may result in special assessments affecting the Purchased Assets.  There are no tax abatements, phase-ins or exemptions affecting the Purchased Assets.

(f)     Access to Property.  Seller has no knowledge of any federal, state, county, municipal or other governmental plans to change the highway or road system in the vicinity of the Property or to restrict or change access from any such highway or road to the Property.

(g)     Existing Mortgages.  Other than any mortgage or deed of trust that shall be assumed by Seller at the Closing, there are no mortgages or deeds of trust currently encumbering the Property, recorded or otherwise.  Except for the Permitted Exceptions, there are no liens, encumbrances, covenants, conditions or restrictions affecting the Property or the other Purchased Assets.  In addition there are no mechanic's liens, materialman's liens or similar claims or liens claimed or which may be claimed against any of the Property or the other Purchased Assets for work performed or commenced prior to the Closing Date.

(h)     Leases.  There are currently, and as of the Closing Date there shall be, no occupancy rights (written or oral), leases or tenancies presently affecting the Property or the Facility and the portion of the Property which it is located, other than the Existing Facility Lease, which shall be terminated as of the Closing Date, and any occupancy rights of any residents of the Facility.

(i)     Permits.  The Permits as listed on Schedule 8(i) hereto are all of the material certificates, licenses and permits from governmental authorities held by Seller in connection with the ownership, use, occupancy, operation and maintenance of the Purchased Assets and the Facility, and are all of the certificates, licenses, accreditations and permits necessary in connection with the current ownership, use, occupancy, operation and maintenance thereof.

(j)     Intellectual Property.   , Seller does not own any registered intellectual property in connection with or applicable to the Property or the other Purchased Assets, including any registered trade names, logotypes, trademarks or copyrights.

(k)     Required Consents.   No consent, order, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required in connection with the execution or delivery by Seller of this Agreement, or the performance of the transactions contemplated thereunder, except (1) approval by KCHFS of the Licensure, and (2) such consents, certifications or licenses from the KCHFS, United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS") or any other governmental agency with jurisdiction over the Facility as are necessary to permit Seller to operate the Facility prior to the Closing Date.

(l)     Sufficiency of Assets.   The Purchased Assets are sufficient for operation of the Facility of 152 skilled nursing beds, in compliance with all Applicable Laws.

(m)     Litigation.   Except as set forth in Schedule 9(m), there are no pending or threatened litigation, investigations, claims, lawsuits, governmental actions or other proceedings, including without limitation, any desk audit or full audit, involving the Purchased Assets, or the operation thereof before any court, agency or other judicial, administrative or other governmental or quasi-governmental body or arbitrator.

(n)     Compliance with Applicable Laws.   The Property (including any parking areas or facilities) and the other Purchased Assets have been and are presently used and operated in compliance with, and in no way violate any applicable statute, law, regulation, rule, licensing requirement, ordinance, order or permit of any kind whatsoever affecting the Purchased Assets or any part thereof, including without limitation, any statutes or laws pertaining to the services and care provided for the residents at the Facility, and any rules or regulations promulgated thereunder ("Applicable Laws"), or any Permitted Exceptions.  In addition, no waivers have been obtain or are required to make the representations contained in this Section 9(n) fully true and correct.

(o)     Taxes.   Seller has timely filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such returns.

(p)     Sprinklers.   There is a sprinkler system at the Facility, that is in full operational compliance with all applicable requirements.

(q)     Brokers.   Seller represents and warrants that it has not dealt with any broker or finder in connection with the transactions contemplated by this Agreement

(r)     Truth and Accuracy of Representations and Warranties.  No representation or warranty by or on behalf of Seller contained in this Agreement and no statement by or on behalf of Seller in any certificate, list, exhibit or other instrument furnished or to be

furnished to Purchaser by or on behalf of Seller pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

(s) <u>Survival of Representations and Warranties</u>. The representations and warranties of Seller contained herein shall survive the Closing.

10. **Purchaser's Representations and Warranties**. Purchaser hereby makes the representations and warranties contained in this <u>Section 10</u>, to Seller. These representations and warranties are made as of the date hereof, and shall be deemed remade as of the Closing Date.

(a) <u>Organization and Authority</u>. Purchaser is a limited liability company that has been duly organized and validly exists under the laws of the State of Indiana. Purchaser has full power and right to enter into and perform its obligations under this Agreement and the Other Documents. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (1) have been duly authorized by all necessary action on the part of Purchaser, (2) do not require any governmental or other consent (except as otherwise provided herein), and (3) will not result in the breach of any agreement, indenture or other instrument to which Purchaser is a party or is otherwise bound.

(b) <u>Survival of Representations and Warranties</u>. The representations and warranties of Purchaser contained herein shall survive the Closing.

11. **Risk of Loss**.

(a) <u>Fire or Other Casualty</u>. The risk of any loss or damage to the Property by fire or other casualty before the Closing hereunder is assumed by Seller. Seller shall give Purchaser written notice of any fire or other casualty within three (3) days of the occurrence of same, which notice shall include a description thereof in reasonable detail and an estimate of the cost of and time to repair. In the event that the Purchased Assets shall suffer any fire or other casualty or any injury and Purchaser does not elect to cancel this Agreement as hereinafter provided, Seller agrees to repair the damage at its sole cost and expense before the date set for delivery of the Deed hereunder or, in the alternative, the Purchase Price shall be reduced based on a reasonable approximation of the cost of such repair as agreed by the parties, and Seller shall assign to Purchaser the proceeds of or claims in respect of any loss of income insurance or equivalent coverage maintained by them. In the event of any material damage or destruction of the Purchased Assets, Purchaser, at any time thereafter, by written notice to Seller, shall have the option to cancel this Agreement. For the purposes hereof, "material" damage or destruction shall include any damage or destruction that would require more than One Hundred Thousand Dollars ($100,000.00) to repair (including in said amount the amount of any revenues lost as a result of said fire or other casualty). If Purchaser so elects to cancel this Agreement, this Agreement shall terminate and be of no further force and effect, Purchaser shall be

refunded the Deposit plus accrued interest and neither party shall have any liability to the other hereunder.

(b)     Eminent Domain.  The risk of any loss or damage to the Purchased Assets by condemnation before the Closing Date hereunder is assumed by Seller.  In the event any condemnation proceeding is commenced or threatened, Seller shall give Purchaser written notice thereof within three (3) days after the occurrence of same, together with such reasonable details with respect thereto as to which Seller may have knowledge.  As soon as the portion or portions of the Purchased Assets to be taken are reasonably determinable, Seller shall give Purchaser written notice thereof together with Seller's estimate of the value of the portion or portions of the Purchased Assets to be so taken.  In the event of any material taking of the Purchased Assets, Purchaser, by written notice to Seller at any time thereafter, shall have the option to cancel this Agreement, in which event this Agreement shall terminate and be of no further force and effect, Purchaser shall be refunded the Deposit plus accrued interest and neither party shall have any liability to the other hereunder.  For the purposes hereof, a "material" taking shall include: (i) any taking (1) the effect of which would be to require more than One Hundred Thousand Dollars ($100,000.00) to repair the balance of the Purchased Assets or (2) materially impair the use or operation of the Purchased Assets; or (ii) any threat of a taking or any reasonably equivalent indication on the part of a condemning authority of such intention where there is no reasonable basis to conclude that the actual taking would not be material.  If Purchaser shall not so elect to cancel this Agreement, then the sale of the Purchased Assets shall be consummated as herein provided that the Purchase Price provided for herein (without abatement) and Seller shall assign to Purchaser at the Closing all of Seller's right, title and interest in and to all awards made in respect of such condemnation and any claims in respect of any rent insurance or equivalent coverage maintained by it, and shall pay over to Purchaser all amounts theretofore received by Seller in connection with such taking or insurance.  Purchaser shall be entitled to participate in any such condemnation proceeding, and Seller shall cooperate with Purchaser in such respect.

(c)     Survival.  The parties' obligations, if any, under this Section 11 shall survive the Closing.

12.     **Indemnification**.

(a)     By Purchaser.  In addition to and not in lieu, place, stead and/or substitution of any other indemnity set forth elsewhere herein, Purchaser shall indemnify, save, protect, defend and hold harmless Seller, their employees, members, managers, shareholders, officers, directors and agents, from and against all claims, liabilities, losses, demands and causes of action of any nature whatsoever ("Losses") arising out of: i) any breach by Purchaser of its obligations, representations, warranties, agreements or covenants hereunder, and ii) Purchaser's ownership of the Purchased Assets following the Closing.  Purchaser further agrees to pay any reasonable attorneys fees and expenses of Seller arising from any indemnification obligation hereunder.

(b)    By Seller.  In addition to and not in lieu, place, stead and/or substitution of any other indemnity set forth elsewhere herein, Seller shall indemnify, save, protect, defend and hold harmless, Purchaser, and its members, managers, employees, shareholders, officers, directors and agents, from and against all Losses arising out of: i) any breach by Seller of their obligations, representations, warranties, agreements or covenants hereunder, and ii)  Seller's ownership of the Facility prior to the Closing. Seller further agrees to pay any reasonable attorneys fees and expenses of Purchaser arising from any indemnification obligation hereunder.

(c)    In the event that any liability, claim, demand or cause of action which is indemnified against by or under any term, provision, section or paragraph of this Agreement ("Indemnitee's Claim") is made against or received by any indemnified party (hereinafter "Indemnitee") hereunder, said Indemnitee shall notify the indemnifying party (hereinafter "Indemnitor") in writing within twenty one (21) calendar days of Indemnitee's receipt of written notice of said Indemnitee's Claim, provided, however, that Indemnitee's failure to timely notify Indemnitor of Indemnitee's receipt of an Indemnitee's Claim shall not impair, void, vitiate or invalidate Indemnitor's indemnity hereunder nor release Indemnitor from the same, which duty, obligation and indemnity shall remain valid, binding, enforceable and in full force and effect so long as Indemnitee's delay in notifying Indemnitor does not, solely by itself, directly and materially prejudice Indemnitor's right or ability to defend the Indemnified Claim.  Upon its receipt of any or all Indemnitee's Claim(s), Indemnitor shall, in its sole, absolute and unreviewable discretion, diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense and shall promptly provide Indemnitee evidence thereof within fourteen (14) calendar days of the final, unappealable resolution of said Indemnitee's Claim.  Upon the receipt of the written request of Indemnitee, Indemnitor shall within two (2) calendar days provide Indemnitee a true, correct, accurate and complete written status report regarding the then current status of said Indemnitee's Claim.  Prior to an Indemnification Default (as defined herein), Indemnitee may not settle or compromise an Indemnitee's Claim without Indemnitor's prior written consent.  Failure to obtain such consent shall be deemed a forfeiture by Indemnitee of its indemnification rights hereunder.  In the event that Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee harmless from and against an Indemnitee's Claim and/or to diligently pursue the same to its conclusion, in the event that Indemnitor cannot produce documentation establishing the availability of funds sufficient to cover its obligations with respect to Indemnitee's Claim or in the event that Indemnitor fails to timely report to Indemnitee the status of its efforts to reach a final resolution of an Indemnitee's Claim, on seven (7) calendar days prior written notice to Indemnitor during which time Indemnitor may cure any of the foregoing conditions, the foregoing shall immediately, automatically and without further notice be an event of default hereunder (an "Indemnification Default") and thereafter Indemnitee may, but shall not be obligated to, immediately and without notice to Indemnitor, except such notice as may be required by law and/or rule of Court, intervene in and defend, settle and/or compromise said Indemnitee's Claim at Indemnitor's sole

and exclusive cost and expense, including but not limited to attorneys' fees, and, thereafter, within seven (7) calendar days of written demand for the same Indemnitor shall promptly reimburse Indemnitee all said Indemnitee's Claims and the reasonable costs, expenses and attorneys' fees incurred by Indemnitee to defend, settle or compromise said Indemnitee's Claims.

(d)     No Waiver of Representations and Warranties. For avoidance of doubt, Seller has agreed that Purchaser's rights to indemnification pursuant to this Agreement shall not be affected or waived by virtue of any investigations or due diligence performed by Purchaser.

(e)     Survival. The parties' obligations under this Section 12 shall survive the Closing.

13.     **Remedies**.

(a)     Seller's Default. If, prior to the Closing, Seller shall default under any covenant or obligation or breach any representation or warranty set forth herein (which default is not waived in writing by Purchaser), or any of the Closing Conditions of Purchaser pursuant to Section 6(a) shall not be satisfied or prepared to be satisfied (any of the foregoing, a "Seller Failure"), then Purchaser shall have the right, at any time to (1) terminate this Agreement by written notice to Seller and receive a refund of the Deposit plus any accrued interest, or (2) specifically enforce this Agreement.

(b)     Purchaser's Default. If, prior to the Closing, Purchaser shall default under any covenant or obligation or breach any representation or warranty set forth herein (which default is not waived in writing by Seller), or any of the Closing Conditions of Seller pursuant to Section 6(b) shall not be satisfied or prepared to be satisfied (any of the foregoing, a "Purchaser Failure"), then Seller shall have the right to declare this Agreement terminated by written notice to Purchaser, in which case provided that no Seller Failure has occurred, the Deposit plus any accrued interest shall be paid to Seller as liquidated damages, as Seller's sole remedy.

14.     **Notices**. All notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly delivered (i) upon the delivery (or refusal to accept delivery) by messenger or overnight express delivery service (or, if such date is not on a business day, on the business day next following such date), or (ii) on the third (3rd) business day next following the date of its mailing by certified mail, postage prepaid, at a post office maintained by the United States Postal Service, or (iii) upon the receipt by facsimile or email transmission as evidenced by a receipt transmission report, addressed as follows:

if to Seller:               c/o Joseph Schwartz
                            505 Marlboro Road
                            WoodRidge, New Jersey 07075

with a copy to:   Saadia Shapiro
Shapiro & Associates
Attorneys At Law, PLLC
3145 Coney Island Avenue
Brooklyn, NY 11235

if to Purchaser:   c/o Strawberry Fields Management Services
6101 Nimtz Parkway
South Bend, IN 46628

with a copy to:   David M. Gross, Esq.
5683 North Lincoln Avenue
Chicago, IL 60659

Either party may, by notice given as aforesaid, change the address or addresses, or designate an additional address or additional addresses, for its notices, <u>provided</u>, <u>however</u>, that no notice of a change of address shall be effective until actual receipt of such notice.

   15.  **Closing Costs**. Seller shall pay for the Title Commitment and Owner's Policy and the cost of the premium attributable to the Title Policy. Seller shall bear the cost to record any instrument to clear Seller's title except the Permitted Exceptions. Seller shall pay all costs and fees customarily paid by sellers in a real estate sale transaction in the City of Hot Springs, Garland County, Arkansas. Purchaser shall pay the cost of any endorsements, except over the standard exceptions, to the Title Policy and the cost of any title insurance policy in favor of Purchaser's lender. Purchaser shall pay all costs related to any third party report. Purchaser and Seller shall each pay half the cost of any escrow fees. Purchaser shall pay all personal property sales tax, transfer taxes, and all costs and fees customarily paid by purchasers in a real estate sale transaction in the City of Hot Springs, Garland County, Arkansas. Seller on one side and Purchaser on the other agree to pay their own attorneys' fees incurred in connection with the negotiation, preparation and consummation of the transactions contemplated hereby.

   16.  **Choice of Law**. THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF ARKANSAS AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS.

   17.  **Miscellaneous**.

    (a)  <u>Entire Agreement</u>. This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire agreement of the parties hereto and may not be modified or canceled except pursuant to the terms hereof or an instrument in writing signed by the parties hereto. The

Schedules and Exhibits annexed hereto are hereby incorporated herein by reference as fully as though set forth herein. This Agreement may not be modified or amended except in writing signed by the parties hereto. All understandings and agreements heretofore and between the parties are merged in this Agreement and all exhibits and schedules attached hereto, which alone fully and completely expresses their agreement.

(b)    Waiver. No waiver of any term, provision or condition of this Agreement, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

(c)    Dispute Resolution. The parties hereto agree that with respect to all disputes, problems or claims arising out of or in connection with this Agreement and all other agreements or other instruments executed in connection herewith (collectively "Disputes"), the parties hereto shall, in good faith, use their reasonable best efforts to resolve the Dispute. If after such efforts the parties hereto are unable within ten (10) days of the arising of the Dispute to resolve the Dispute in good faith, then other than with respect to any action for specific performance hereunder, either party may submit to final and binding arbitration before the American Arbitration Association ("AAA"), with an office located in Chicago, IL, or its successor, pursuant to the Federal Arbitration Act, 9 U.S.C. Sec. 1 *et seq.* The parties hereto agree that the rules of the American Arbitration Association applicable to commercial arbitrations shall apply to any such arbitration and that the Expedited Procedures under the Commercial Arbitration Rules shall apply. Either party may commence the arbitration process called for in this Agreement by filing a written demand for arbitration with AAA, with a copy to the other party. The arbitration will be conducted in Chicago, IL in accordance with the provisions of AAA Streamlined Arbitration Rules and Procedures in effect at the time of filing of the demand for arbitration. The parties will cooperate with AAA and with one another in selecting an arbitrator from AAA panel of neutrals, and in scheduling the arbitration proceedings. The provisions of this Section 17(c) with respect to the arbitration before AAA may be enforced by any court of competent jurisdiction. The fees and expenses of such arbitration, including attorneys' fees, shall be borne by the non-prevailing party, as determined by such arbitration. Upon the mutual agreement of the parties involved in the Dispute, the parties may submit to final and binding arbitration before any other recognized alternative dispute resolution company or organization. The parties hereto agree that this Section 17(c) has been included to rapidly and inexpensively resolve any disputes between them with respect to the matters described above, and that this paragraph shall be grounds for dismissal of any court action commenced by any party with respect to a dispute arising out of such matters.

(d)    Jurisdiction; Venue. EXCEPT AS PROVIDED OTHERWISE IN THIS AGREEMENT, IN THE EVENT ANY DISPUTE BETWEEN THE PARTIES HERETO RESULTS IN LITIGATION, OR TO THE EXTENT A PARTY MUST GO TO A COURT OF LAW TO ENFORCE A JUDGMENT ARRIVED AT THROUGH ARBITRATION PURSUANT TO SECTION 17(c) OF THIS AGREEMENT, ALL

SUCH ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREIN SHALL BE LITIGATED IN COURTS HAVING SITUS IN ARKANSAS OR THE U.S. COURT WITH JURISICTION THEREOF. EACH OF THE PARTIES HERETO HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE. EACH OF THE PARTIES HERETO HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED. THE PARTIES HERETO HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH PARTY IN ACCORDANCE WITH THIS SECTION.

(e)     Exhibits and Schedules. If any exhibits or schedules are not attached hereto, the parties hereto agree to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date. Purchaser's obligations to close pursuant to this Agreement shall be conditioned upon Purchaser approving all exhibits and schedules within seven (7) days of submission thereof to Purchaser. The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date.

(f)     Headings. The headings of the various Sections of this Agreement have been inserted only for the purposes of convenience, are not part of this Agreement and shall not be deemed in any manner to modify, explain, qualify or restrict any of the provisions of this Agreement.

(g)     Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had executed the same document. All such counterparts shall be construed together and shall constitute one instrument.

(h)     Further Assurances. Each of Seller and Purchaser shall provide to the other such further assurances as may reasonably be required hereunder to effectuate the purposes of this Agreement and, without limiting the foregoing, shall execute and deliver such affidavits, certificates and other instruments as may be provided for hereunder.

(i)     Severability. If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this

Agreement shall not be affected thereby, but, each term and provision shall be valid and be enforced to the fullest extent permitted by law.

(j)    <u>Usage</u>.    All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "or" shall mean "and/or" "including" shall mean "including without limitation.

(k)    <u>No Strict Construction</u>.    The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

*[Remainder of this page left intentionally blank.  Signature page follows.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be signed as of the day and year first above written.

**SELLER:**
552 Golf Links Road Realty, LLC
An Arkansas limited liability company

By: _____
Name: Rosie Schwartz
Its:    Manager

*[Remainder of this page left intentionally blank, signature page follows]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be signed as of the day and year first above written.

**PURCHASER:**

552 Golf Links Road, LLC,
An Indiana limited liability company

By: _____
Name: Moishe Gubin
Its:    Manager

EXHIBIT A - Legal Description of Land

LOT FIVE (5) IN THE NW1/4 SE1/4, SECTION 16 TOWNSHIP 3 SOUTH RANGE 19 WEST, GARLAND COUNTY ARKANSAS, Less and Except therefrom: That portion sold to the City of Hot Springs in Quitclaim Deed recorded in Book 1145 at Page 743 of the Deed and Mortgage Records of Garland County, Arkansas, and Less and Except therefrom: That part of said lot which is North of Golf Links Road and more: particularly described as follows: Commence at the N.W. corner of the NW1/4 SE1/4 of said Section 16; run South 15 feet; thence east 20 feet to the N.W. corner of said Lot 5, a distance of 637.00 feet to the East line of said Lot 5; thence South 05 degrees 28'06 East along said East line a distance of 11.86 feet to the North Right-of-way line of Golf Links Road; thence Southwesterly along said right-of-way a distance of 749.22 feet, more or less to the West line of said 5; thence North 05 degrees 37'42"West, a distance of 98.90 feet to the Point of Beginning. As shown on a survey by Frank Roberts, RPLS #1140 dated April 8,2004

EXHIBIT B - Allocation of Purchase Price

<u>552 Golf Links Road Realty, LLC: 552 Golf Links Road, Hot Springs, Arkansas 71901</u>

| | |
|---|---|
| Furniture, Fixtures & Equipment | $1,520,000 |
| Land | $100,000 |
| Building | $2,280,000 |
| Goodwill | $1,023,980.89 |

EXHIBIT C - Reserved

EXHIBIT D - Form of Deed

After recording please return to:
David M. Gross
5683 North Lincoln Avenue
Chicago, IL 60659

# WARRANTY DEED

**KNOW ALL MEN BY THESE PRESENTS:**

That, **552 Golf Links Road Realty, LLC,** an Arkansas limited liability company, hereinafter called GRANTOR, for and in consideration of the sum of ---ONE AND 00/100--- DOLLAR---($1.00)--- and other good and valuable consideration, in hand paid by **552 Golf Links Road, LLC,** an Indiana limited liability company, the receipt of which is hereby acknowledged, do hereby grant, bargain, sell and convey unto **552 Golf Links Road, LLC,** an Indiana limited liability company, hereinafter called GRANTEE, and unto its successors and assigns forever, the following described lands lying in Garland County, Arkansas to-wit:

LOT FIVE (5) IN THE NW1/4 SE1/4, SECTION 16 TOWNSHIP 3 SOUTH RANGE 19 WEST, GARLAND COUNTY ARKANSAS, Less and Except therefrom: That portion sold to the City of Hot Springs in Quitclaim Deed recorded in Book 1145 at Page 743 of the Deed and Mortgage Records of Garland County, Arkansas, and Less and Except therefrom: That part of said lot which is North of Golf Links Road and more: particularly described as follows: Commence at the N.W. corner of the NW1/4 SE1/4 of said Section 16; run South 15 feet; thence east 20 feet to the N.W. corner of said Lot 5, a distance of 637.00 feet to the East line of said Lot 5; thence South 05 degrees 28'06 East along said East line a distance of 11.86 feet to the North Right-of-way line of Golf Links Road; thence Southwesterly along said right-of-way a distance of 749.22 feet, more or less to the West line of said 5; thence North 05 degrees 37'42" West, a distance of 98.90 feet to the Point of Beginning. As shown on a survey by Frank Roberts, RPLS #1140 dated April 8,2004

**Subject to easements, rights-of-way, and protective covenants of record, if any.**

**TO HAVE AND TO HOLD** the same unto the said Grantee and unto its successors and assigns forever, with all appurtenances thereunto belonging. And the Grantor hereby covenants with said Grantee that it will forever warrant and defend the title to the said lands against all claims whatsoever.

**IN TESTIMONY WHEREOF,** the name of the grantor and its seal are hereunto affixed by its duly authorized Manager, this $\underline{29^{th}}$ day of April, **2019.**

**552 Golf Links Road Realty, LLC,**
an Arkansas limited liability company

By: Rosie Schwartz
Its: Manager and Member/Manager of its sole member,
Little Ark Realty Holdings, LLC, an Arkansas limited liability company

I certify under penalty of false swearing that documentary
stamps or a documentary symbol in the legally correct
amount has been placed on this instrument.
**552 Golf Links Road, LLC,** an Indiana limited liability
company

By: Moishe Gubin, Manager

GRANTEE'S ADDRESS:    6101 Nimtz Parkway South
Bend, IN 46628

## ACKNOWLEDGMENT

STATE OF NEW YORK                    )
                                     ) SS.
COUNTY OF _Kings_                    )

On this day before the undersigned, a Notary Public, duly commissioned, qualified and acting, within and for the said County and State, appeared in person the within named **Rosie Schwartz** to me personally known or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument, who stated that she is the authorized Manager of **552 Golf Links Road Realty, LLC, an Arkansas limited liability company** and is the sole **Member and Manager of its sole member, Little Ark Realty Holdings, LLC, an Arkansas limited liability company** and is duly authorized in her capacity to execute the foregoing instrument for and in the name and behalf of said company, and further stated and acknowledged that she had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and official seal this $\underline{29^{th}}$ day of April, 2019.

_____

Notary Public

My commission expires: __01/20/2021__

MARINA TERDIMAN
Notary Public, State of New York
No. 01TE6199661
Qualified in Kings County
Commission Expires January 20, 20 21

EXHIBIT E - Form of Bill of Sale and Assignment

## BILL OF SALE AND ASSIGNMENT

1.    **Sale and Transfer of Sale Assets.**  For good and valuable consideration, the receipt, adequacy, and legal sufficiency of which are hereby acknowledged, and as contemplated by Section 1 of that certain Asset Purchase Agreement dated as of April 17, 2019 (the "Purchase Agreement"), by and between 552 Golf Links Road Realty, LLC, an Arkansas Limited Liability Company, ("Seller"), and 552 Golf Links Road, LLC, an Indiana limited liability company ("Purchaser"), the Seller hereby sells, transfers, assigns, and delivers to Purchaser, effective as of April 17, 2019 (the "Transfer Date"), all of the Seller's right, title, and interest in and to all of the sale assets as provided in the Purchase Agreement – and all capitalized terms not defined herein shall have the meaning as provided in Purchase Agreement, including, without limitation the following, free and clear of all liens, security interests, claims and encumbrances:

(i)    all systems, furniture, equipment, supplies, and other items of personal tangible and intangible property used and useful in connection with the ownership, operation, and maintenance of the Facility (collectively, the "Personal Property");

(ii)    all easements, licenses, rights, and appurtenances relating to any of the foregoing, to the extent legally assignable and excluding those licenses and permits Seller requires to operate the Facility ("Permits");

(iii)    all of Seller's rights, title, and interest in and to those contracts, agreements, and leases to which Purchaser has agreed to assume ("Assumed Contracts");

(iv)    all of Seller's rights to park motor vehicles in any parcels adjoining the Land ("Parking Rights"); and

(v)    other than the Excluded Assets, all other tangible and intangible personal property assets owned and used by Seller in connection with the operation of the Property and all other rights to own and operate the Facility.

2.    **Appointment of Purchaser.**  Sellers hereby designates and appoints Purchaser, and its successor and assigns, as its true and lawful attorney to demand and receive from time to time any and all of the Sale Assets hereby sold, assigned, conveyed, granted, warranted, transferred, and delivered; to institute and prosecute any and all proceedings to collect or enforce any claim, right, or title of any kind in or to the Sale Assets sold, assigned, conveyed, granted, warranted, transferred, and delivered; and to defend or compromise any and all actions, suits, or proceedings with respect to the Sale Assets.

3. **Acknowledgement of Inspection.** Purchaser acknowledges that Purchaser conducted all desired inspections of the Sale Assets on or prior to the Transfer Date and is satisfied in all respects with the condition of the Sale Assets.

4. **Condition of Sale Assets at Closing.** Purchaser, for Purchaser and Purchaser's employees, agents, subcontractors, successors, assigns, or any other person or entity with whom Purchaser has a relationship, releases Seller, Seller's employees, agents, subcontractors, successors, assigns, or any other person or entity with whom Seller has a relationship (collectively "Seller's Affiliates"), from, and waives all claims and liability against Seller and Seller's Affiliates for, any structural, physical or other adverse physical conditions of the Sale Assets and further releases Seller and Seller's Affiliates from, and waives all liability against Seller and Seller's Affiliates attributable to, the structural, physical, or other adverse condition of the Sale Assets. Purchaser hereby acknowledges and agrees that it shall rely on its investigations and studies conducted and prior to sale. Purchaser has made such studies and investigations and engaged such specialists as Purchaser deemed appropriate to fairly evaluate the Sale Assets to Purchaser's satisfaction. Purchaser's investigations, tests, and studies have revealed no imperfections or only imperfections that Purchaser now waives, as Purchaser is satisfied with the condition of the Sale Assets.

5. **"As Is" Sale.** PURCHASER ACKNOWLEDGES THAT IT HAS HAD AN ADEQUATE OPPORTUNITY TO INSPECT THE SALE ASSETS AND ACCEPTS THE RISK THAT ANY INSPECTION MAY NOT DISCLOSE ALL MATERIAL MATTERS AFFECTING THE SALE ASSETS, IT BEING THE SOLE AND EXCLUSIVE RESPONSIBILITY OF PURCHASER TO CONDUCT SUCH TESTS AND INSPECTIONS OF THE SALE ASSETS DESIRED BY PURCHASER TO DETERMINE THAT THE SALE ASSETS ARE IN SUITABLE CONDITION FOR PURCHASER'S INTENDED USE AND PURPOSES FOLLOWING CLOSING. SUBJECT ONLY TO THE TERMS OF SECTION 7 OF THE PURCHASE AGREEMENT, PURCHASER AGREES TO ACCEPT THE SALE ASSETS IN THEIR "AS IS" "WHERE IS" AND "WITH ALL FAULTS" CONDITION WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER INCLUDING AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND WITHOUT ANY RIGHT OF SET-OFF OR REDUCTION IN THE PURCHASE PRICE.

6. **Terms of the Purchase Agreement.** Capitalized terms used but not defined herein shall have the respective meanings ascribed thereto in the Purchase Agreement. The terms of the Purchase Agreement, including but not limited to Seller's representations, warranties, covenants, agreements, and indemnities relating to the Sale Assets, are incorporated herein by this reference. In the event of any conflict between this Bill of Sale and Assignment and the Purchase Agreement, the terms of the Purchase Agreement shall prevail, govern, and be controlling; and nothing herein shall be deemed to amend, modify, supplement, or supersede the terms of the Purchase Agreement, which shall survive the execution and delivery of this Bill of Sale and Assignment as and to the extent provided in the Purchase Agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Seller has executed and delivered this Bill of Sale and Assignment as of the date set forth above. This Bill of Sale and Assignment may be executed in separate counterparts and delivered by facsimile or PDF transmission, any of which, when so executed, shall be deemed to be an original and all of which, when taken together, shall constitute but one and the same document.

**SELLER:**

552 Golf Links Road Realty, LLC
An Arkansas limited liability company

By: _____
Name: Rosie Schwartz
Its:    Manager

## ACCEPTANCE OF ASSIGNMENT

The undersigned, being duly authorized, hereby accepts the foregoing Bill of Sale and Assignment for and on behalf of 552 Golf Links Road, LLC, an Indiana limited liability company, and the "Purchaser" herein.

552 Golf Links Road, LLC,
An Indiana limited liability company

By: _____
Name: Moishe Gubin
Its:    Manager

EXHIBIT F - Form of FIRPTA Affidavit

## CERTIFICATION OF ENTITY TRANSFEROR RELATING TO FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT

Section 1445 of the Internal Revenue Code of 1986, as amended, provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.

To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by **552 Golf Links Road Realty, LLC** ("**Seller**"), the undersigned hereby certifies the following on behalf of the transferor:

1.      Seller is not a foreign corporation, foreign partnership, foreign trust, foreign estate, or foreign person (as those terms are defined in the Internal Revenue Code and Income Tax Regulations promulgated thereunder);

2.      Seller is not a disregarded entity as defined in Section 1.1445-2(b)(2)(ii) of the Internal Revenue Code of 1986, as amended;

3.      Seller's U.S. employer identification number is 81-3254444; and

4.      Seller's address is 505 Marlboro Road, Wood Ridge, New Jersey, 07075.

5.      The real property being sold is located at 552 Golf Links Road, Hot Springs, Arkansas 71901.

Seller understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under the penalties of perjury, the undersigned declare that they have examined this certification and to the best of their knowledge and belief it is true, correct and complete, and they further declare that they have authority to sign this document on behalf of Seller.

Dated: April 24th 2019

**552 Golf Links Road Realty, LLC**
An Arkansas limited liability company


By: Rosie Schwartz
Its: Manager

SCHEDULE 1 - Excluded Assets


None

SCHEDULE 3(a)

Debt Assumption Amount $14,383,207.35 which includes the conveyance of 326 Lindley Lane and 2821 West Dixon Road. The parties hereto recognize that the $14,383,207.35 debt encumbers all three properties, and accordingly, will be assumed in connection with the acquisition of all three by Purchaser and its affiliates. Assumption of the underlying principal debt shall include assumption of any penalties, interests, or any other claims made by the lender, related to the above-mentioned debt. Purchaser will hold Seller harmless for any and all claims made by lender related to this debt.

SCHEDULE 9(I) - Permits

None

Schedule 9(M)- Litigation

Seller to Provide Within Seven (7) Days of Closing