**OPERATIONS TRANSFER AGREEMENT**

by and between

Madison Healthcare and Rehabilitation Center, LLC,

An Arkansas Limited Liability Company,

"Old Operator"

and

The Waters of West Dixon, LLC,

An Arkansas Limited Liability Company,

"New Operator"

Dated as of: August 15, 2018

Address of Facility

2821 West Dixon Road, Little Rock, AR 72206

TABLE OF CONTENTS

**SECTION**                                                                                         **PAGE**

1.   CLOSING. .................................................................................................................. 1

2.   CONDITIONS PRECEDENT ..................................................................................... 1

3.   LIABILITIES OF LESSOR........................................................................................ 4

4.   CONVEYANCE OF SUPPLIES ................................................................................ 4

5.   TRANSFER OF PATIENT TRUST FUNDS............................................................. 4

6.   COST REPORTS; OVERPAYMENTS, CIVIL MONETARY PENALTIES..................... 5

7.   CONTRACTS.............................................................................................................. 6

8.   ACCOUNTS RECEIVABLE; ACCOUNTS PAYABLE ........................................... 8

9.   EMPLOYEES .............................................................................................................. 8

10.  EMPLOYMENT RECORDS ...................................................................................... 8

11.  ACCESS TO RECORDS............................................................................................. 9

12.  USE OF TELEPHONE NUMBER ............................................................................. 9

13.  PROVIDER AGREEMENTS...................................................................................... 9

14.  COOPERATION; INTERIM OPERATION OF THE FACILITY ........................... 10

15.  INDEMNIFICATION................................................................................................ 11

16.  REPRESENTATIONS AND WARRANTIES OF NEW OPERATOR .................... 12

17.  REPRESENTATIONS AND WARRANTIES OF OLD OPERATOR ..................... 10

18.  NO JOINT VENTURE .............................................................................................. 12

19.  EXHIBITS AND SCHEDULES................................................................................ 13

20.  EVENTS OF DEFAULT; REMEDIES..................................................................... 18

21.  CHOICE OF LAW .................................................................................................... 18

22.  DISPUTE RESOLUTION ......................................................................................... 18

23.  JURISDICTION; VENUE......................................................................................... 19

24.  ATTORNEYS FEES IN THE EVENT OF DISPUTE.............................................. 20

25.  DEFINITIONS .......................................................................................................... 20

26.  GENERAL PROVISIONS ........................................................................................ 20

## OPERATIONS TRANSFER AGREEMENT

This **OPERATIONS TRANSFER AGREEMENT** (this "Agreement") is entered into this 15th day of August, 2018 (the "Effective Date") by and between Madison Healthcare and Rehabilitation Center, LLC, an Arkansas limited liability company ("Old Operator") and The Waters of West Dixon, LLC, an Arkansas limited liability company ("New Operator").

WITNESSETH:

**WHEREAS**, Dixon Realty, LLC ("Lessor") currently owns that certain real property improved with that certain 140-licensed bed skilled nursing facility (consisting of 140 skilled nursing beds and 0 intermediate beds) commonly known as Madison Healthcare and Rehabilitation Center, LLC, located at 2821 West Dixon Road, Little Rock, AR 72206 (the "Facility"); and all of the furniture, fixtures and equipment and other items of personal property located therein (the "Personal Property" and collectively with the Facility, the "Property");

**WHEREAS**, New Operator is leasing the Property from Lessor, under that certain Lease by and between Lessor and New Operator, dated as of even date herewith (the "Lease"); and

**WHEREAS**, in order to ensure a smooth transition of operations of the Facility, the parties hereto desire to enter into this Agreement.

**NOW, THEREFORE**, for the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged by the parties hereto, the parties hereto agree as follows:

1.     **CLOSING**.     The closing ("Closing") under this Agreement shall occur concurrently with the Closing pursuant to the Lease, following the satisfaction of all conditions precedent as set forth in <u>Section 2</u> below (the "Closing Date").

2.     **CONDITIONS PRECEDENT**.     New Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the following conditions precedent on and as of the Closing Date to the reasonable satisfaction of New Operator or the waiver thereof by New Operator, which waiver shall be binding upon New Operator only to the extent made in writing and dated as of the Closing Date:

a.     Old Operator shall have duly and timely performed and fulfilled all of its duties, obligations, promises, covenants and agreements hereunder;

b.     Each of the representations and warranties of Old Operator contained in this Agreement shall be true and correct as of the Closing Date;

c.     Old Operator shall not be in breach of any term, provision or condition of this Agreement;

d.     Old Operator shall deliver to New Operator on or before the Closing Date the following, each of which shall be in form and substance satisfactory to New Operator:

1.     a bill of sale, in substantially the form annexed hereto as **Exhibit A** (the "Bill of Sale"), containing a warranty of title, duly executed and acknowledged by Old Operator, sufficient to convey to New Operator good and indefeasible title, free of all liens, encumbrances and security interests, in and to the Supplies (as herein defined);

2. an assignment by Old Operator, in substantially the form annexed hereto as **Exhibit B** (the "General Assignment"), of all of Old Operator's right, title and interest in, to and under:

i. the Assumed Contracts (as defined herein);

ii. the Patient Trust Funds and Property (as defined herein);

iii. the Provider Agreements (as defined herein);

iv. the Resident Agreements (as defined herein);

v. the name "Madison Healthcare and Rehabilitation Center" and

vi. the Website Material (as defined herein).

3. a certificate of Old Operator, in a form reasonably acceptable to New Operator, executed by a duly authorized officer of Old Operator or of its manager, dated the Closing Date, to the effect that the representations and warranties of Old Operator set forth in this Agreement are true and complete on and as of the Closing Date to the best of such party's knowledge;

4. a certificate from Old Operator, executed by a duly authorized officer of Old Operator, certifying the corporate documents of Old Operator including the (A) Articles of Organization, (B) by-laws, and (C) resolutions authorizing the transactions contemplated hereby, and appearing on said certificate shall be the true and correct signatures of all authorized persons who have executed this Agreement (and all documents to be executed and delivered by Old Operator pursuant hereto (the "Other Documents")); and

5. a duly executed termination agreement, between Lessor and Old Operator, terminating the Old Lease.

e. As of the Closing Date there shall not then be imposed against Old Operator, nor shall have Old Operator received notice of: (a) any civil monetary penalty ("CMP") or other federal, state or local fine and/or penalty ("Penalty"), (b) any withholding, recoupment, repayment, recapture and/or recovery of any alleged overpayment by Medicaid or Medicare and/or any alleged underpayment of any tax and/or assessment, including but not limited to State Bed Tax/Assessment (collectively, "Recapture") or (c) any survey deficiency of the severity level of "D" or worse.

f. On or before the Closing Date, Old Operator shall have transferred to New Operator the Patient Trust Funds and Property on the Closing Date in compliance with all governmental statutes, rules and regulations with respect to the transfer of such Patient Trust Funds and Property and in accordance with the provisions of Section 5 below;

g. Between the Effective Date and the Closing Date, there shall not have been any material adverse change in the regulatory status and/or condition of any of Old Operator's licenses, permits and/or certifications, and the Medicare and Medicaid rates of the Facility;

h. Between the Effective Date and the Closing Date, there shall not have been any material adverse change to the business operations and financial condition of

2

the Facility;

i.    On the Closing Date, there shall not be any lawsuits filed or threatened against Old Operator which are not covered by insurance and being defended, subject to policy limits and any reservation of rights; nor shall there be any actions, suits, claims or other proceedings, pending or threatened, or injunctions or orders entered, pending or threatened against Old Operator, to restrain or prohibit the consummation of the transactions contemplated hereby;

j.    New Operator shall have received ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES approval of the Licensure, subject to conditions acceptable to New Operator in its reasonable discretion;

k.    Affiliates of New Operator and Old Operator shall have entered into OTAs for the facilities on Schedule 2(k).

l.    New Operator shall have approved of any updates to the Schedules and/or Exhibits, pursuant to Section 19 hereof; and

m.    Lessor and New Operator shall have entered into, and consummated the transactions contemplated under, the Lease.

Old Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the following conditions precedent on and as of the Closing Date to the reasonable satisfaction of Old Operator or the waiver thereof by Old Operator, which waiver shall be binding upon New Operator only to the extent made in writing and dated as of the Closing Date:

a.    New Operator shall have duly and timely performed and fulfilled all of its duties, obligations, promises, covenants and agreements hereunder;

b.    Each of the representations and warranties of New Operator contained in this Agreement shall be true and correct as of the Closing Date;

c.    New Operator shall not be in breach of any term, provision or condition of this Agreement;

d.    New Operator shall have executed and delivered to Old Operator the Other Documents, as applicable; and

e.    Lessor and New Operator shall have entered into, and consummated the transactions contemplated under, the Lease.

In the event that either of the parties hereto (a "Waiving Party") waives a condition precedent to its performance hereunder, or otherwise elects to proceed with the Closing despite the fact that one or more conditions precedent to its performance have not been satisfied, such action by the Waiving Party shall in no way be deemed a waiver of any payment, indemnification or other rights of the Waiving Party with respect to such condition, and the Waiving Party shall be entitled, following the Closing, to pursue any and all available remedies at law or equity with respect thereto.

**3.    LIABILITIES OF OLD OPERATOR.**

a.    New Operator shall not assume and shall not be liable for, and Old Operator shall indemnify New Operator for, any debts, liabilities or obligations of the

3

Old Operator including, but not limited to, any (i) any expenses of Old Operator that accrue or arise prior to the Closing, (ii) liabilities or obligations of the Old Operator to its creditors, shareholders, members or owners, (iii) liabilities or obligations of the Old Operator with respect to any Contracts, acts, events or transactions occurring prior to, on or after the Closing, (iv) liabilities or obligations of the Old Operator for any federal, state, county or local taxes applicable to or assessed against the Old Operator or the assets or business of the Old Operator that accrue for time before the Closing, (v) any contingent liabilities or obligations of the Old Operator, whether known or unknown by the Old Operator or New Operator, or (vi) any other liabilities resulting from any act or failure to act by Old Operator prior to the Closing.

b.     New Operator shall have no duty whatsoever to take any action or receive or make any payment or credit arising from or related to any services provided or costs arising from or related to any services provided or costs incurred in connection with the management and operation of the Facility prior to the Closing, including, but not limited to, any matters relating to Contracts, cost reports, collections, audits, hearing, or legal action arising therefrom.

**4.     CONVEYANCE OF SUPPLIES.**     On the Closing Date, Old Operator shall transfer to New Operator all food, central supplies, linens and housekeeping supplies and other consumable and non-consumable inventory maintained with respect to the Facility (the "Supplies"). Old Operator shall have no obligation to deliver the Supplies to any location other than that at which each item of Supplies is currently located, and New Operator agrees that the presence of the Supplies at the Facility on the Closing Date shall constitute delivery thereof. Notwithstanding the foregoing, Old Operator shall have the affirmative obligation to disclose to New Operator the location of any Supplies that are not located at the Facility on the Closing Date.

**5.     TRANSFER OF PATIENT TRUST FUNDS.**

a.     Prior to the Closing, Old Operator shall provide to New Operator a true, correct and complete accounting (properly reconciled) certified as being true, correct and complete by Old Operator of any patient trust funds and an inventory of all residents' property held by Old Operator on the Closing Date for patients at the Facility, a copy of which shall be attached hereto as Schedule 5.a. ("Patient Trust Funds and Property").

b.     Old Operator will indemnify, defend and hold New Operator harmless from any and all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees: i) in the event the amount of funds or any property, if any, transferred to New Operator did not represent the full amount of the funds and/or property delivered to Old Operator as of the Closing Date, ii) with respect to any Patient Trust Funds and Property delivered, or claimed to have been delivered, to Old Operator, but which were not delivered by Old Operator to New Operator, or iii) for claims which arise from actions or omissions of Old Operator with respect to the Patient Trust Funds and Property prior to the Closing Date.

c.     New Operator will indemnify, defend and hold Old Operator harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event a claim is made against Old Operator with respect to the Patient Trust Funds and Property where said funds were transferred to

4

New Operator pursuant to the terms hereof, or for claims which arise from actions or omissions of New Operator after the Closing Date with respect to Patient Trust Funds and Property actually received by New Operator.

## 6.     COST REPORTS; OVERPAYMENTS, CIVIL MONETARY PENALTIES.

a.     Old Operator shall prepare and file with the appropriate Medicare and Medicaid agencies its final cost reports in respect to its operation of the Facility as soon as practicable after the Closing Date, but in any event prior to the expiration of the period of time as may be required by law for the filing of each such final cost report under the applicable third party payor program, it being specifically understood and agreed that the intent and purpose of this provision is to ensure that the reimbursement paid to New Operator for the period beginning on the Closing Date is not delayed, reduced or offset in any manner as a result of Old Operator's failure to timely file such final cost reports.

b.     Each party hereto agrees to notify the other within five (5) business days after receipt of any notice of any claim by ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES, CMS, OIG or any other governmental or quasi governmental authority with respect to any of the following, relating to periods prior to the Closing: i) an alleged Medicare or Medicaid overpayment, or any other recoupment or adjustment to reimbursement, ii) an alleged underpayment of any tax or assessment or iii) any other governmental or third-party payor claims (collectively "Recapture Claim"). For avoidance of doubt, the failure to provide notification of a Recapture Claim within the foregoing timeframe shall in no way effect a party's rights to indemnification with respect thereto.

c.     In the event ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES, CMS, OIG, any other governmental or quasi governmental authority or agency making payments to New Operator for services performed at the Facility after the Closing or any other third-party payor makes any Recapture Claim, then Old Operator hereby agrees to save, indemnify, defend and hold New Operator harmless from and against any loss, damage, injury or expense incurred by New Operator arising from or related to any such claim. In connection with the foregoing indemnification obligation, in the event that ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES, CMS, OIG or any other governmental or quasi governmental authority or agency or any other governmental or quasi governmental authority or agency or other third party payor source withholds amounts from New Operator's reimbursement checks as a result of such Recapture Claim, Old Operator shall pay such amounts to New Operator within three (3) business days following New Operator's demand therefor. In the event Old Operator fails to pursue any issue or issues relating to appeal of a Recapture Claim, New Operator may, at Old Operator's expense, pursue an appeal of such issue or issues and Old Operator will cooperate fully with New Operator in such appeal, including by providing copies of any documentation required to substantiate costs reported on the cost reports.

d.     Old Operator shall pay, prior to the Closing, all outstanding Recapture Claims and any other fees and taxes due with respect to the Facility for periods prior to the Closing, and shall provide to New Operator, on or before the Closing, evidence reasonably satisfactory to New Operator of the foregoing payments. Old Operator shall

5

also remain liable and responsible for the correction of all violations cited by ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES or any other governmental authority in any survey prior to or after the Closing, that result from a condition that existed at the Facility prior to the Closing Date or as a result of an action or inaction of Old Operator prior to the Closing Date.

      e.      Old Operator shall deliver to New Operator copies of any Medicare and Medicaid cost reports for the Facility that have not been filed as of the Effective Date, for New Operator's review, at least ten (10) days prior to filing of such reports, and provide New Operator with reasonable access to the underlying documentation for such reports.

      f.      Old Operator shall remain liable for all Arkansas bed taxes (franchise permit fee) relating to periods prior to the Closing, and shall promptly and timely pay all such amounts when due. New Operator shall be liable for all Arkansas bed taxes (franchise permit fee) relating to periods on and after the Closing, and shall promptly and timely pay all such amounts when due.

**7.**    **CONTRACTS**.

      a.      As soon as practicable after the date hereof, the Old Operator shall deliver to the New Operator true, accurate and complete copies of all Contracts, a schedule of which is attached hereto as Schedule 7.a. In accordance with the terms of the General Assignment, Old Operator shall assign to New Operator all of Old Operator's rights, title and interest in, to and under the Contracts chosen by New Operator in its sole discretion and set forth in Schedule 7.b. hereto (the "Assumed Contracts," and the Contracts not assigned to New Operator shall be referred to as the "Rejected Contracts"). Old Operator shall remain responsible for all liabilities and obligations (i) under the Rejected Contracts, (ii) under the Assumed Contracts to the extent such liabilities and obligations accrue or arise prior to the Closing Date, or (iii) for services or supplies which were performed or rendered prior to the Closing Date, and shall indemnify and hold New Operator harmless on account of the same. New Operator agrees to indemnify and hold harmless Old Operator from and against any and all liabilities, claims, demands and causes of action of any nature whatsoever asserted against or incurred by Old Operator arising out of or connected with any liabilities and obligations under any of the Assumed Contracts that shall accrue or relate to periods on or after the Closing Date.

      b.      To the extent any third party consent is required in connection with the assignment and assumption of the Assumed Contracts, Old Operator hereby covenants and agrees to use its best efforts to obtain such third party consent prior to the Closing Date. To the extent Old Operator shall be unable to obtain such third party consent, Old Operator and New Operator shall cooperate and take such steps as may be necessary in order for New Operator to receive the benefits under such Assumed Contracts, provided that New Operator agrees to fulfill any obligations of Old Operator that shall arise with respect to such Assumed Contracts on and after the Closing Date.

      c.      Old Operator shall also transfer, convey and assign to New Operator on the Closing Date all existing agreements with residents and any guarantors thereof (the "Resident Agreements"), to the extent assignable by Old Operator.

**8.**    **EMPLOYEES**.

a.     Old Operator shall terminate the employment of all employees providing services at the Facility, a listing of which is attached hereto as <u>Schedule 8.a.</u> (such listing, to include the current base salaries of all such employees) (the "Current Employees"), as of the Closing Date.  New Operator shall not be bound by or assume any employment contracts to which Old Operator may be a party.  Other than consistent with past practice, Old Operator shall not make any material changes in the compensation or benefits of the employees at the Facility prior to the Closing Date.

b.     New Operator shall determine, in its sole discretion, which of the Current Employees shall be offered employment with New Operator, pursuant to employment terms acceptable to New Operator (hereinafter, the "Retained Employees").  Nothing in this paragraph, however, shall create any right in favor of any person not a party hereto, including without limitation, the Current Employees, or constitute an employment agreement or condition of employment for any employee of Old Operator or any affiliate of Old Operator who is a Current Employee.

c.     On the Closing Date, Old Operator shall provide New Operator with a credit of an amount equal to all of the accrued (whether vested, unvested, contingent or mature) paid time off (which shall include all days for which Retained Employees are paid but do not actually work, such as sick days, vacation days, and holidays) and all other accrued but unpaid payroll obligations including but not limited to all FICA, withholding, unemployment, workmen's compensation, union dues or other employment related taxes in connection with the foregoing ("<u>Old Operator's Employment Expenses</u>").  New Operator expressly acknowledges that New Operator shall assume all obligations related to Old Operator's Employment Expenses.  A schedule of Old Operator's Employment Expenses is attached <u>hereto as Schedule 8(c)</u>, and shall be updated prior to the Closing to reflect amounts outstanding at the Closing.  In the event that New Operator discovers after the Closing Date that the amount credited is less than the amounts required under this Section 8(c), Old Operator shall pay to New Operator, within ten (10) days after New Operator provides notice thereof, an amount equal to such deficiencies.

9.     <u>ACCOUNTS RECEIVABLE</u>.

a.     Old Operator shall retain the right to collect all unpaid accounts receivable with respect to periods prior to the Closing.  If at any time after the Closing Date, New Operator shall receive any payment from any federal or state agency, which payment includes any reimbursement with respect to payments or underpayments made to Old Operator for services rendered prior to the Closing Date, then New Operator shall remit such payments to Old Operator.  New Operator and Old Operator shall send copies of all Medicare and Medicaid remittance advices to the other party for purposes of recording and pursuing accounts receivable for the period of twelve (12) months following the Closing Date and thereafter as reasonably requested by each party.  If at any time after the Closing Date, Old Operator shall receive any payment from any federal or state agency, which payment represents reimbursement with respect to payments or underpayments made to New Operator for services rendered on or after the Closing Date, then Old Operator shall remit such payments to New Operator. If at any time after the Closing Date, New Operator shall receive any payment from any federal or state agency, which payment represents reimbursement with respect to payments or underpayments made to Old Operator for services rendered before the Closing Date, then New Operator

7

shall remit such payments to Old Operator. Any such remittances pursuant to this <u>Section 9.a.</u> shall occur within two (2) days from the date the party required to make such remittance receives payment thereof.

b.     Any non-designated payments received by New Operator or Old Operator from non-governmental payment sources shall first be applied to any post-Closing balances due to New Operator for services provided following the Closing (with the excess, if any, applied to any post-Closing balances due for services rendered by Old Operator prior to the Closing).

c.     All bi-weekly bad debt Medicare payments received by the Facility on or after the Closing Date shall be paid to New Operator. This provision shall not in any way impact the final bad debt amount determined by Medicare after Old Operator's final cost report is submitted, and Old Operator shall be solely liable for such amount.

**10.**    **EMPLOYMENT RECORDS**. Old Operator shall deliver to New Operator, prior to the Closing Date, either the originals or full and complete copies of all employee records for all Retained Employees in its possession (including, without limitation, all employee employment applications, W-4's, I-9's and any disciplinary reports) (collectively, the "Employee Records"). Old Operator represents and warrants to New Operator that the Employee Records delivered to New Operator represent all employee records in Old Operator's possession or control as of the Closing Date.

**11.**    **ACCESS TO RECORDS**.

a.     On the Closing Date, Old Operator shall deliver to New Operator all of the records of the Facility, including patient medical and financial records, provided, however, that nothing herein shall be construed as precluding Old Operator from removing from the Facility on the Closing Date its corporate financial records which relate to its operations at the Facility or to its overall corporate operations; and provided, further, that Old Operator shall give New Operator access to any information in any such removed records as is necessary for the efficient and lawful operation of the Facility by New Operator or is otherwise required by law to be maintained at the Facility.

b.     Subsequent to the Closing Date, New Operator shall allow Old Operator and its agents and representatives to have reasonable access to (upon reasonable prior notice and during normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including the Closing Date, at its own expense, to the extent reasonably necessary to enable Old Operator to investigate and defend malpractice, employee or other claims, to file or defend cost reports and tax returns and to verify accounts receivable collections due Old Operator.

c.     Old Operator shall, if allowed by applicable law and subject to the terms of such applicable law, be entitled to remove any records delivered to New Operator, for purposes of litigation involving a resident or employee to whom such record relates, as certified to New Operator in writing prior to removal by an officer of or counsel for Old Operator in connection with such threatened or actual litigation. Any record so removed shall promptly be returned to New Operator following its use.

8

d.     New Operator agrees to maintain such books, records and other material comprising records of the Facility's operations prior to the Closing Date that have been received by New Operator from Old Operator or otherwise, including patient records and records of patient funds, to the extent required by law, but in no event less than three (3) years.

**12.     USE OF TELEPHONE NUMBER AND WEBSITE; POLICY AND PROCEDURE MANUALS.**

a.     New Operator may use the present telephone numbers as well as any websites or internet domain names ("Website Materials") of the Facility.  Old Operator shall as of the Closing Date transfer or cause to be transferred, at its expense, the telephone numbers used by the Facility.

b.     Old Operator agrees to leave its policy and procedure manuals at the Facility and to transfer all of its right, title and interest in and to such policy and procedure manuals to New Operator under the Bill of Sale referenced in <u>Section 2</u> of this Agreement.

**13.     PROVIDER AGREEMENTS.**  For any periods following the Closing that New Operator is not yet able to bill under its Medicaid and/or Medicare provider agreements (the "Provider Agreements"), Old Operator shall allow New Operator to bill under Old Operator's Provider Agreements, to the extent permitted by applicable law, and Old Operator shall, forward to New Operator any payments received with respect thereto within two (2) business days of receipt of such payments.

**14.     COOPERATION; INTERIM OPERATIONS OF THE FACILITY.**   Old Operator agrees to cooperate with New Operator, and New Operator agrees to cooperate with Old Operator to effect an orderly transfer of the operation of the Facility.  Old Operator shall fully cooperate with New Operator in connection with submitting an application to ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES with respect to the Licensure, as well as any applications with respect to the Provider Agreements, and shall also fully cooperate with regard to any additional actions or information required with respect to approval of the Licensure and/or New Operator's Provider Agreements, or otherwise requested in connection with the transactions contemplated herein.

From the date of this Agreement until the Closing, Old Operator shall operate the Facility in substantially the same manner as it has heretofore operated, use commercially reasonable and diligent efforts to preserve intact the business operations and relationships of the Facility with third parties and use commercially reasonable best efforts to keep available the services of all of the Facility's employees.  Without limiting the generality of the preceding sentences, until the earlier of (i) the Closing Date, or (ii) the termination of this Agreement, Old Operator shall:

a.     operate the Facility in the normal course of business and in compliance with all laws, ordinances, orders, rules, regulations and requirements of any federal, state or municipal governmental agency or authority;

b.     provide New Operator with a written weekly status report, setting forth the current census, new admissions with payor source, and any significant financial or operational developments.

c.     maintain the Facility's licensure status in substantial compliance with all

9

applicable laws, rules and regulations;

       d.     not sell, transfer or otherwise dispose of any of the Supplies except in the ordinary course of business consistent with the prior practices of Old Operator, in which event Old Operator shall replace the same with similar property of equal quality, value and usefulness;

       e.     not enter into any contract which shall become the obligation of New Operator nor modify, cancel, accept the surrender of or renew (except when any such acceptance of surrender or renewal is non-discretionary) any Contract which exists at present without New Operator's prior written consent;

       f.     not decrease the private pay rates of the residents of the Facility without the prior written consent of New Operator;

       g.     maintain records in accordance with all applicable federal and state laws and in such manner so that all records will be prepared in a consistent manner and will be current, complete, accurate and true;

       h.     not increase or promise to increase any wages or benefits of, or grant or promise to grant any bonuses to, any of the employees of the Facility without the prior written consent of New Operator;

       i.     not take any action which will or would cause any of the representations or warranties in this Agreement to become untrue or be violated;

       j.     perform all of its obligations in respect of the Facility whether pursuant to any contracts, or other requirements, including payment before the same shall become due of all taxes, duties and other governmental charges that accrue prior to the Closing Date;

       k.     not transfer residents from the Facility to any other skilled nursing facility, other than as requested by such resident or as required for the care of such resident; and

       l.     promptly inform New Operator in writing of any material event adversely affecting the ownership, use, occupancy, operation, management or maintenance of the Facility, whether or not insured against.

New Operator and Old Operator agree and acknowledge that the employees at the Facility provide valuable services that are crucial for the success of the Facility, and New Operator's decision to serve as certified operator of the Facility is based upon the skills and qualifications of such employees. As such, in the event that during the period beginning on the Effective Date and ending upon the date that is two (2) years following Closing, any Current Employee is hired for employment by any person or entity that either directly or indirectly controls, is under common control with or is otherwise affiliated with Old Operator, then Old Operator shall pay to New Operator an amount equal to Fifty Thousand Dollars ($50,000.00) as liquidated damages, for each such Current Employee. The parties agree and acknowledge that actual damages with respect to the foregoing would be difficult to ascertain and that Fifty Thousand Dollars ($50,000.00) is a fair and reasonable approximation of such actual damages.

**15.**    **INDEMNIFICATION**.

a. In addition to and not in lieu, place, stead or substitution of any other indemnity set forth elsewhere herein, New Operator hereby agrees to indemnify, save, protect, defend and hold harmless Old Operator, its shareholders, directors, officers, employees and agents, from and against all liabilities, claims, losses, demands and causes of action of any nature whatsoever (collectively, "Losses") arising out of: i) New Operator's operation of the Facility subsequent to the Closing, ii) any breach by New Operator of its obligations, representations, warranties or covenants hereunder, or iii) injury to or death of persons or loss of or damage to property occurring on or at the Facility or in any manner growing out of or connected with the use or occupancy of the Facility or the condition thereof, or the use of any adjoining sidewalks, streets or ways on or after the Closing. New Operator further agrees to pay any reasonable attorney's fees and expenses incident to the defense by Old Operator of any such Losses.

b. In addition to and not in lieu, place, stead or substitution of any other indemnity set forth elsewhere herein, Old Operator hereby agrees to indemnify, save, protect, defend and hold harmless, New Operator and its members, managers, employees and agents, from and against all Losses arising out of: i) Old Operator's operation of the Facility prior to the Closing Date, ii) any breach by Old Operator of its obligations, representations, warranties or covenants hereunder, iii) any Recapture Claim, iv) any liabilities, claims, demands and causes of action of any nature whatsoever for injury to or death of persons or loss of or damage to property occurring on or at the Facility or in any manner growing out of or connected with the use or occupancy of the Facility or the condition thereof, or the use of any adjoining sidewalks, streets or ways prior to the Closing or v) any resident present at the Facility on the Closing Date, for whom a recognized payor source cannot be obtained following the Closing. Old Operator further agrees to pay any reasonable attorney's fees and expenses incident to the defense by New Operator of any such Losses.

c. In the event that any liability, claim, demand or cause of action which is indemnified against by or under any term, provision, section or paragraph of this Agreement ("Indemnitee's Claim") is made against or received by any indemnified party (hereinafter "Indemnitee") hereunder, said Indemnitee shall notify the indemnifying party (hereinafter "Indemnitor") in writing within twenty one (21) calendar days of Indemnitee's receipt of written notice of said Indemnitee's Claim, provided, however, that Indemnitee's failure to timely notify Indemnitor of Indemnitee's receipt of an Indemnitee's Claim shall not impair, void, vitiate or invalidate Indemnitor's indemnity hereunder nor release Indemnitor from the same, which duty, obligation and indemnity shall remain valid, binding, enforceable and in full force and effect so long as Indemnitee's delay in notifying Indemnitor does not, solely by itself, directly and materially prejudice Indemnitor's right or ability to defend the Indemnified Claim. Upon its receipt of any or all Indemnitee's Claim(s), Indemnitor shall diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense and shall promptly provide Indemnitee evidence thereof within fourteen (14) calendar days of the final, unappealable resolution of said Indemnitee's Claim. Upon the receipt of the written request of Indemnitee, Indemnitor shall within two (2) calendar days provide Indemnitee a true, correct, accurate and complete written status report regarding the then current status of said Indemnitee's Claim. Prior to an Indemnification Default (as defined herein), Indemnitee may not settle or compromise an

11

Indemnitee's Claim without Indemnitor's prior written consent. Failure to obtain such consent shall be deemed a forfeiture by Indemnitee of its indemnification rights hereunder. In the event that Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee harmless from and against an Indemnitee's Claim (or in the event sufficient funds are not available for such indemnification) and/or to diligently pursue the same to its conclusion, or in the event that Indemnitor fails to timely report to Indemnitee the status of its efforts to reach a final resolution of an Indemnitee's Claim, on seven (7) calendar days prior written notice to Indemnitor during which time Indemnitor may cure any alleged default hereunder, the foregoing shall immediately, automatically and without further notice be an event of default hereunder (an "Indemnification Default") and thereafter Indemnitee may, but shall not be obligated to, immediately and without notice to Indemnitor, except such notice as may be required by law and/or rule of Court, intervene in and defend, settle and/or compromise said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense, including but not limited to attorneys' fees, and, thereafter, within seven (7) calendar days of written demand for the same Indemnitor shall promptly reimburse Indemnitee all said Indemnitee's Claims and the reasonable costs, expenses and attorneys' fees incurred by Indemnitee to defend, settle or compromise said Indemnitee's Claims.

        d.      For avoidance of doubt, Old Operator has agreed that New Operator's rights to indemnification pursuant to this Agreement shall not be affected or waived by virtue of any investigations or due diligence performed by New Operator.

        e.      The parties' obligations under this <u>Section 15</u> shall survive the Closing for a period of 10 years.

      **16.**    **<u>REPRESENTATIONS AND WARRANTIES OF NEW OPERATOR</u>**. As an inducement to Old Operator to enter into this Agreement, New Operator covenants and makes the following representations and warranties set forth below, which are true and correct as of the date hereof and which shall be true and correct on the Closing Date:

        a.      <u>Organization and Authority</u>. New Operator is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Arkansas and as of the Closing Date will have, all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so. This Agreement has been duly and validly executed and delivered by New Operator and is enforceable against New Operator in accordance with its terms.

        b.      <u>No Violations</u>. Neither the execution and delivery of this Agreement, or any agreement referred to or contemplated hereby, by New Operator will:

        i.      violate any provision of its Operating Agreement; or

        ii.      be in conflict with constitute a default or create a right of termination or cancellation under any agreement or commitment to which New Operator is a party.

        c.      <u>Accuracy of Representations and Warranties of New Operator</u>. No representation or warranty by or on behalf of New Operator contained in this Agreement

12

and no statement by or on behalf of New Operator in any certificate, list, exhibit, schedule or other instrument furnished or to be furnished to Old Operator by or on behalf of New Operator pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

    d. <u>Survival of Representations and Warranties of New Operator</u>. Each representation and warranty of New Operator hereunder shall be true, complete and correct as of the Closing Date with the same force and effect as though such representation or warranty was made on such date, and all representations and warranties shall survive the Closing for a period of 10 years.

    **17.** **<u>REPRESENTATIONS AND WARRANTIES OF OLD OPERATOR</u>**. As an inducement to New Operator to enter into this Agreement, Old Operator covenants and makes the following representations and warranties, which are true and correct as of the date hereof and which shall be true and correct as of the Closing Date:

    a. <u>Organization and Authority</u>. Old Operator is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Arkansas, and has all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so. This Agreement has been duly and validly executed and delivered by Old Operator and is enforceable against Old Operator in accordance with its terms.

    b. <u>No Violations</u>. Neither the execution and delivery of this Agreement, or any agreement referred to or contemplated hereby, by Old Operator will:

      i. violate any provision of its by-laws;

      ii. be in conflict with constitute a default or create a right of termination or cancellation under any agreement or commitment to which Old Operator is a party or which pertains to the Property or the Facility; and

      iii. result in the creation or imposition of any security interest, lien or other encumbrance upon any of the Property.

    c. <u>Supplies</u>. Each and every item constituting a portion of the Supplies are owned by Old Operator free and clear of all liens and claims of all other parties. The Supplies are sufficient in quantity for the proper conduct and operation of the Facility as a skilled nursing home facility of at least 140 beds (consisting of 140 skilled nursing beds and 0 intermediate beds) in substantial compliance with all applicable laws, ordinances, rules and regulations, including, without limitation, the minimum standards of ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES.

    d. <u>Contracts</u>. Old Operator has the power and authority to assign each of the Assumed Contracts to New Operator, subject to any consent requirements under such Assumed Contracts. Each of the Assumed Contracts shall be assigned by Old Operator and assumed by New Operator pursuant to the terms and conditions of this Agreement. Old Operator has made available to New Operator a correct and complete copy of each of

13

the Contracts. To the extent any of the Assumed Contracts requires third party consent in order to assign the same, Old Operator shall obtain such consent prior to the Closing Date. Each of the Assumed Contracts is legal, valid, binding and enforceable. Neither the Old Operator nor the other party to each of the Assumed Contracts are in material breach or default, and, no event has occurred which with notice or lapse of time would constitute such a breach or default, or permit termination, modification or acceleration under such Assumed Contract. Neither Old Operator nor the other party to each of the Assumed Contracts have repudiated any material provision of such Assumed Contract.

        e.     <u>No Consent Required</u>. No consent, order, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required in connection with the execution or delivery by Old Operator of this Agreement, or the performance by Old Operator of this Agreement, prior to, or as of or at the Closing Date, or as a consequence thereof, or with the consummation by Old Operator of transactions contemplated hereby to be consummated prior to, as of or at the Closing Date, except (i) the receipt by New Operator of a long term care facility license for the Facility from ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES for 140-licensed beds (consisting of 140 skilled nursing beds and 0 intermediate beds), and (ii) such other consents, certifications or licenses from the ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES, CMS, or any other governmental agency with jurisdiction over the Facility as necessary to permit New Operator to operate the Facility, and (iii) such other consents or licenses required to operate a nursing home in the City of Little Rock, Arkansas.

        f.     <u>Litigation</u>. Except as set forth on <u>Schedule 17.f.</u>, there are no pending, nor threatened claims, lawsuits, governmental actions or other proceedings, including without limitation, any desk audit or full audit described in below, involving the Facility or the operation thereof before any court, agency or other judicial, administrative or other governmental body or arbitrator.

        g.     <u>Overpayments</u>. Except as set forth on <u>Schedule 17.g.</u>, there are no pending, nor, threatened claims, demands or other notices of or action alleging the overpayment of Medicaid, Medicare or other governmental or quasi-governmental reimbursements or demanding the return of such alleged overpayments by any third party payor, nor is Old Operator aware of any grounds for such claim or demand.

        h.     <u>Audits</u>. Old Operator agrees to fully cooperate with New Operator in connection with any audit by ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES, CMS, or other applicable governmental regulatory agency in connection with any Medicaid or Medicare cost reports filed by Old Operator, including but not limited to providing New Operator with any and all necessary documentation, supporting schedules and personnel in its possession in order to properly support the dollar figures and classifications/characterizations contained in Old Operator's cost reports so that New Operator's Medicaid or Medicare reimbursements are maximized.

        i.     <u>Licensure</u>. The Facility (i) is and shall on the Closing Date be licensed by ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES as a 140 bed skilled nursing facility (consisting of 140 skilled nursing beds

14

and 0 intermediate beds) and (ii) possesses the requisite Certificate of Need from the ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES to operate a 140 bed skilled nursing facility (consisting of 140 skilled nursing beds and 0 intermediate beds) (collectively the "Licensure"). Such licenses and certificates are and shall on the Closing Date be unrestricted, unconditional, in good standing and in full force and effect and subject to no waivers or limitations. Except as set forth on Schedule 17.i., Old Operator has not received any written notice from the ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES or any other governmental agency requiring the correction of any condition with respect to such license or certificate which has not been the subject of a plan of correction for which compliance has been affected and Old Operator has no reason to believe that the good standing of any such license or certificate is in jeopardy.

j.      Certification.  The Facility is, and shall be on the Closing Date, certified for participation in the Medicare and Medicaid reimbursement programs.  Such certification is and shall on the Closing Date be in good standing and full force and effect and subject to no restrictions or limitations.  Old Operator has not received any notice from ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES, CMS, or any other governmental agency requiring the correction of any condition with respect to such certification which has not been the subject of a plan of correction for which compliance has been affected and Old Operator has no reason to believe that the good standing of such certification is in jeopardy.  Old Operator shall promptly comply with any violation notices concerning the Facility received after the date hereof and before the Closing Date to the extent that any such notice requires compliance activities. In addition to, and not in any manner limiting the generality of, the foregoing, during the three-year period prior to the Closing Date, except as set forth in Schedule 17.j., Old Operator has not received any of the following with respect to the Facility:

1.      A notice of "immediate jeopardy" violations;

2.      A notice of termination of the license issued by ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES to operate the Facility as a 140 bed skilled nursing facility (consisting of 140 skilled nursing beds and 0 intermediate beds);

3.      A notice of termination of the certification issued by ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES or CMS of the Facility to participate in the Medicare and/or Medicaid reimbursement programs;

4.      A notice that the Facility is not in substantial compliance with the requirements for participation in the Medicare and/or Medicaid reimbursement programs;

5.      A notice that the Facility has been placed, or will be placed, on the special focus facilities list;

6.      A notice that the Facility will be prohibited from admitting, or will not be reimbursed for, new residents;

15

7.      A notice of imposition of civil monetary penalties or other intermediate sanctions in accordance with 42 CFR § 488.430 et seq.; and

8.      A notice of the commencement of any investigation proceedings or any governmental investigation or action (including any civil investigative demand or subpoena) under the False Claims Act (31 U.S.C. Section 3729 et seq.), the Anti-Kickback Act of 1986 (41 U.S.C. Section 51 et seq.), the Federal Health Care Programs Anti-Kickback statute (42 U.S.C. Section 1320a-7a(b)), the Ethics in Patient Referrals Act of 1989, as amended (Stark Law) (42 U.S.C. 1395nn), the Civil Money Penalties Law (42 U.S.C. Section 1320a-7a), or the Truth in Negotiations (10 U.S.C. Section 2304 et seq.), Health Care Fraud (18 U.S.C. 1347), Wire Fraud (18 U.S.C. 1343), Theft or Embezzlement (18 U.S.C. 669), False Statements (18 U.S.C. 1001), False Statements (18 U.S.C. 1035), and Patient Inducement Statute and equivalent state statutes or any rule or regulation promulgated by a governmental authority with respect to any of the foregoing healthcare fraud laws affecting Old Operator with respect to the Facility.

k.      Cost Reports.  Old Operator has filed, or will file, within the appropriate reporting period and with the appropriate authority, all cost reports required to be filed with respect to periods prior to the date hereof relating to the Facility.  All such reports have been or will be prepared in all respects in accordance with all applicable laws, rules and regulations.

l.      Life Care Contracts.  The Facility is not a party to any life care contract with respect to any resident of the Facility.

m.      Personal Property and Residents.  Unless specifically permitted pursuant to the terms of this Agreement, Old Operator shall not remove any items of personal property from the Facility nor shall it transfer residents from the Facility to a skilled/intermediate care nursing home facility owned or operated by an entity which is owned in whole or part, directly or indirectly, by the principals of Lessor or Old Operator.  The information set forth in the admission agreements and patient rolls pertaining to residents of the Facility is true and correct in all material respects as of the respective dates of such admission agreements and patient rolls, and there are no patient care agreements with respect to any resident of the Facility which differs materially from the standard form used at the Facility.

n.      Personal Needs Allowance.  Old Operator is currently in material compliance with all state and federal regulations relating to maintaining and accounting for the personal needs allowance ("PNA") for residents who request the establishment of a PNA account.  Except as set forth in Schedule 17.n., Old Operator has no knowledge of and has not received any notice from any governmental authority citing or alleging any violation by Old Operator or the Facility of any state or federal PNA regulations.

o.      Furniture.  There are at the Facility a number of beds equal to the maximum bed capacity as permitted under the Facility license.  Each bed is in good repair and conforms with the minimum standards set forth under the regulations adopted by ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES.  For each such bed, there also exists the minimum furnishings, fixtures and other accessories required by ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES.

p.     Labor Unions.  Except as set forth in Schedule 17.p., Old Operator is not party to any collective bargaining agreement with any labor union or similar organization, nor does Old Operator know of any such organization which represents or claims to represent any of Old Operator's employees or intends to organize any of Old Operator's employees.

q.     Multi-Employer Plans.  Old Operator does not, and is not required to, contribute (and has not ever contributed or been required to contribute) to any multi-employer plan, as defined in Section 3(37) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") with respect to the Current Employees.

r.     Employee Benefit Plans.  Except as provided in Schedule 17.r.:

   i.     Old Operator does not maintain or contribute to any non-qualified deferred compensation or retirement plans, contracts or arrangements;

   ii.    Old Operator does not maintain or contribute to any qualified defined contribution plans (as defined in Section 3(34) of ERISA, or Section 414(i) of the Internal Revenue Code of 1986, as amended (the "Code"));

   iii.   Old Operator does not maintain or contribute to any qualified defined benefit plans (as defined in Section 3(35) of ERISA or Section 414(j) of the Code);

   iv.    Old Operator does not maintain or contribute to any employee welfare benefit plans (as defined in Section 3(1) of ERISA); and

   v.     Old Operator has not entered into, nor has Old Operator established or maintained, any change-in-control or severance agreements or plans.

s.     Environmental Condition.   Old Operator has not generated, stored or disposed of any Hazardous Substances on the Facility or the Property, nor has there been any previous generation, storage, disposal or existence of any hazardous waste on the Facility or the Property, except in such quantities that is customary in the operation of a skilled and/or intermediate care and in all events in accordance with all Environmental Laws.

t.     Compliance with Applicable Laws.   The Property has been and is presently used and operated in compliance in all respects with, and in no way violates any applicable statute, law, regulation, rule, licensing requirement, ordinance, order or permit of any kind whatsoever affecting the Property or any part thereof, and any rules or regulations promulgated thereunder, as well as any thereof relating to wages, hours, hiring, promotions, retirement, working conditions, nondiscrimination, health, safety, pensions and employee benefits, but not including any Environmental Laws.  Any representations or warranties related to Environmental Laws under this Agreement are contained in Section 17.s. above.  In addition, no waivers have been obtained or are required to make the representations contained in this Section 17.t. fully true and correct.

u.     Taxes. Old Operator has timely filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such returns.

v.     Financial Materials.  All materials and/or documents relating to the

17

financial condition and/or census of the Facility, provided by Old Operator to New Operator, are true and complete in all material respects, and are not misleading in any material respect.

w. <u>Accuracy of Representations and Warranties of Old Operator</u>. No representation or warranty by or on behalf of Old Operator contained in this Agreement and no statement by or on behalf of Old Operator in any certificate, list, exhibit or other documents or materials furnished or to be furnished to New Operator by or on behalf of Old Operator contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

x. <u>Survival of Representations and Warranties of Old Operator</u>. Each representation and warranty of Old Operator hereunder shall be true, complete and correct as of the Closing Date with the same force and effect as though such representation or warranty was made on such date, and all representations and warranties shall survive the Closing Date for a period of 10 years.

18. **NO JOINT VENTURE**. Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto with respect to the subject matter hereof. The parties hereto do not intend that any third party shall have any rights under this Agreement.

19. **EXHIBITS AND SCHEDULES**. If any exhibits or schedules are not attached hereto, the parties hereto agree to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date. New Operator's obligations to close pursuant to this Agreement shall be conditioned upon New Operator approving all exhibits and schedules within seven (7) days of submission thereof to New Operator. The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date.

20. **EVENTS OF DEFAULT; REMEDIES**. Except as to those specific notices and cure periods, if any, particularly set forth elsewhere herein, the breach by either party ("Defaulting Party") hereto of any term, provision, condition, promise, covenant, agreement, representation, warranty, guaranty, indemnity, duty or obligation if not cured within five (5) business days of the earlier of said Defaulting Party's receipt or refusal of written notice of the same from the other party ("Non-Defaulting Party") hereto shall automatically and without further notice hereunder be an immediate event of default ("Event of Default") entitling the Non-Defaulting Party to exercise any and all remedies available to it hereunder or in law or equity, including seeking specific performance and/or monetary damages. The Non-Defaulting Party's rights and remedies hereunder shall be cumulative and not mutually exclusive and the exercise by the Non-Defaulting Party of one or more rights or remedies granted it hereunder or in law or equity shall not be deemed, interpreted or construed as an election of the same or to bar, prevent or preclude the simultaneous or consecutive exercise of any other right or remedy granted to the Non-Defaulting Party hereunder or in law or equity, including but not limited to the simultaneous or successive pursuit of money damages and injunctive relief. The Non-Defaulting Party shall not be required to post any bond, surety or security of any nature whatsoever to pursue injunctive relief, the necessity or requirement for the same being hereby waived by the

Defaulting Party.

**21.** **CHOICE OF LAW**. THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF ARKANSAS AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS.

**22.** **DISPUTE RESOLUTION**. The parties hereto agree that with respect to all disputes, problems or claims arising out of or in connection with this Agreement and all other agreements or other instruments executed in connection herewith (collectively "Disputes"), the parties hereto shall, in good faith, use their reasonable best efforts to resolve the Dispute. If after such efforts the parties hereto are unable within ten (10) days of the arising of the Dispute to resolve the Dispute in good faith, then other than with respect to any action for specific performance hereunder, either party may submit to final and binding arbitration before the American Arbitration Association ("AAA"), with an office located in Arkansas or its successor, pursuant to the Federal Arbitration Act, 9 U.S.C. Sec. 1 *et seq.* The parties hereto agree that the rules of the American Arbitration Association applicable to commercial arbitrations shall apply to any such arbitration and that the Expedited Procedures under the Commercial Arbitration Rules shall apply. Either party may commence the arbitration process called for in this Agreement by filing a written demand for arbitration with AAA, with a copy to the other party. The arbitration will be conducted in Arkansas, in accordance with the provisions of AAA Streamlined Arbitration Rules and Procedures in effect at the time of filing of the demand for arbitration. The parties will cooperate with AAA and with one another in selecting an arbitrator from AAA panel of neutrals, and in scheduling the arbitration proceedings. The provisions of this Section 22 with respect to the arbitration before AAA may be enforced by any court of competent jurisdiction. The fees and expenses of such arbitration, including attorneys' fees, shall be borne by the non-prevailing party, as determined by such arbitration. Upon the mutual agreement of the parties involved in the Dispute, the parties may submit to final and binding arbitration before any other recognized alternative dispute resolution company or organization. The parties hereto agree that this Section 22 has been included to rapidly and inexpensively resolve any disputes between them with respect to the matters described above, and that this paragraph shall be grounds for dismissal of any court action commenced by any party with respect to a dispute arising out of such matters.

**23.** **JURISDICTION; VENUE**. EXCEPT AS PROVIDED OTHERWISE IN THIS AGREEMENT, IN THE EVENT ANY DISPUTE BETWEEN THE PARTIES HERETO RESULTS IN LITIGATION, OR TO THE EXTENT A PARTY MUST GO TO A COURT OF LAW TO ENFORCE A JUDGMENT ARRIVED AT THROUGH ARBITRATION PURSUANT TO SECTION 22 OF THIS AGREEMENT, ALL SUCH ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREIN SHALL BE LITIGATED IN COURTS HAVING SITUS IN THE CITY OF LITTLE ROCK, PULASKI COUNTY, ARKANSAS OR THE U.S. COURT WITH JURISICTION THEREOF. EACH OF THE PARTIES HERETO HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE. EACH OF THE PARTIES HERETO HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL

PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED. THE PARTIES HERETO HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH PARTY IN ACCORDANCE WITH THIS SECTION.

    **24.**   **DEFINITIONS**. For purposes of this Agreement, the following terms shall have the following meanings (all terms used in this Agreement which are not defined in this paragraph shall have the meanings set forth elsewhere in this Agreement):

    *"CMS"* shall mean the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services.

    *"Contracts"* shall mean all contracts, agreements, leases, commitments and arrangements (whether written or oral), including all service contracts, maintenance contracts and consulting agreements, and all of Old Operator's duties, obligations, covenants, promises, rights and privileges therein or thereunder to which the Old Operator or its predecessors or agents is a party and which relate to the Facility and the operations thereof.

    *"ARKANSAS DEPARTMENT OF HUMAN SERVICES/DIVISION OF MEDICAL SERVICES"* shall mean the Arkansas Department of Public Health.

    *"Environmental Laws"* shall mean all federal, state and local environmental, health, or safety laws or regulations now or hereafter enacted.

    *"Hazardous Substances"* shall mean any toxic or hazardous waste or pollutants, or substances, including, without limitation, asbestos, PCB's, petroleum products and by products, substances defined or listed as: "Hazardous Substances " or "Toxic Substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA.") as amended, 42 U.S.C. § 9601, et seq., "Hazardous Materials" in the Hazardous Materials Transportation Act, 49 U.S.C. § 1802, et seq., "Hazardous Waste" in The Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., any chemical substance or mixture regulated under the Toxic Substance Control Act of 1976, as amended, 15 U.S.C. § 2061, et seq., any "Toxic Pollutant" under the Clean Water Act, 33 U.S.C. §125 1, et seq., as amended, any "Hazardous Air Pollutant" under the Clean Air Act, 42 U.S.C. § 7401, et seq., and any hazardous or toxic substance or pollutant regulated under any other applicable federal, state or local Environmental Laws.

    *"OIG"* shall mean the United States Department of Health and Human Services, Office of Inspector General.

    **25.**   **GENERAL PROVISIONS**.

        a.    Each party hereto agrees to use commercially reasonable efforts to cause the conditions to its obligations and to the other party's obligations herein set forth to be satisfied at or prior to the Closing Date. Each of the parties hereto agrees to execute and deliver any further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder. Each party

shall promptly notify the other party of any information delivered to or obtained by such party which would prevent the consummation of the transactions contemplated hereby, or which would indicate a breach of the representations or warranties of any other party hereto.

        b.      All notices to be given by either party to this Agreement to the other party hereto shall be in writing, and shall be: (i) given in person; (ii) deposited in the United States mail, certified or registered, postage prepaid, return receipt requested; (iii) sent by national overnight courier service, priority next business day service; or (iv) sent by facsimile or e-mail (followed by delivery by one of the other means identified in (i)-(iii)) each addressed as follows:

if to Old Operator:

with a copy to:

| if to new Operator: | Madison Healthcare- A Waters Community, LLC |
| --- | --- |
| | 240 Fencl Ln |
| | Hillside, IL 60162 |
| with a copy to: | Michele Benae Bush |
| | 240 Fencl Ln |
| | Hillside, IL 60162 |

Any such notice personally delivered shall be deemed delivered when actually received; any such notice deposited in, the United States mail, registered or certified, return receipt requested, with all postage prepaid, shall be deemed to have been given on the earlier of the date received or the date when delivery is first refused; any notice deposited with an overnight courier service for delivery shall be deemed delivered on the next business day following such deposit; and any such notice delivered via facsimile shall be deemed delivered upon the notifying party's receipt of facsimile confirmation provided that the notifying party follows up such facsimile transmission with one of the other means identified above. Any party to whom notices are to be sent pursuant to this Agreement may from time to time change its address for further communications thereunder by giving notice in the manner prescribed herein to all other parties hereto.

        c.      Each party hereto shall bear its own legal, accounting and other expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transaction contemplated hereby, whether or not the transaction is consummated.

        d.      This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all negotiations, prior

discussions and preliminary agreements.

　　　　e.　　This Agreement may not be modified or amended except in writing signed by the parties hereto.

　　　　f.　　No waiver of any term, provision or condition of this Agreement, if any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

　　　　g.　　This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. Captions of paragraphs are for convenience only and are not part of this Agreement and do not affect, change or modify the paragraphs they precede.

　　　　h.　　All understandings and agreements heretofore and between the parties are merged in this Agreement and all exhibits and schedules attached hereto, which alone fully and completely expresses their agreement.

　　　　i.　　This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement.

　　　　j.　　All of the provisions of this Agreement shall be deemed and construed to be "conditions" and "covenants" as though the words specifically expressing or importing covenants and conditions were used in each separate provision hereof

　　　　k.　　Each party hereto agrees to use such party's reasonable best efforts to cause the conditions to such party's obligations herein set forth to be satisfied at or prior to the Closing. Each of the parties agrees to execute and/or deliver any and all further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by any other party to assist with consummation of the transactions contemplated herein, or to evidence its rights hereunder.

　　　　l.　　The recitals set forth at the beginning of this Agreement constitute an integral part of this Agreement and are hereby incorporated by reference herein and made apart hereof as if fully set forth herein.

　　　　m.　　All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or " any" shall mean "any and all"; "or" shall mean "or" "including" shall mean "including without limitation.

　　　　n.　　If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but, each term and provision shall be valid and be enforced to the fullest extent permitted by law.

　　　　o.　　The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

[SIGNATURE PAGE FOLLOWS ON NEXT PAGE]

**IN WITNESS WHEREOF,** the parties hereby execute this Agreement as of the day and year first above written.

**OLD OPERATOR:**                                   **NEW OPERATOR:**

Madison Healthcare and Rehabilitation Center, LLC    The Waters of West Dixon, LLC, An
An Arkansas Limited Liability Company                Arkansas Limited Liability Company

By: _____                         By: _____
Name: Joseph Schwartz                                Name: Michael Blisko
Its: Manager                                         Its:    Manager